# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 25-2049

––––––––––––––––––––

THE UNITED STATES OF AMERICA *ex. rel.*
JESSE M. POLANSKY, M.D., M.P.H.,

*Plaintiff-Appellant,*

v.

GEISINGER HOLY SPIRIT;
GEISINGER COMMUNITY MEDICAL CENTER;
GEISINGER MEDICAL CENTER;
SPIRIT PHYSICIAN SERVICES INC.,

*Defendants-Appellees.*

––––––––––––––––––––

On appeal from the United States District Court
for the Middle District of Pennsylvania
No. 1:20-CV-599-JFS (Judge Joseph J. Saporito, Jr.)

––––––––––––––––––––

## SUPPLEMENTAL APPENDIX
## SA1–85

––––––––––––––––––––

Daniel T. Brier
Donna A. Walsh
Myers, Brier & Kelly, LLP
425 Biden Street, Suite 200
Scranton, PA 18503
(570) 342-6100
dbrier@mbklaw.com
dwalsh@mbklaw.com

Matthew L. Knowles
Dana M. McSherry
Mara Theophila
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000
mknowles@mwe.com
dmcsherry@mwe.com
mtheophila@mwe.com

*Counsel for Defendants-Appellees*

**SUPPLEMENTAL APPENDIX TABLE OF CONTENTS**

| Description | SA Pages |
|---|---|
| United States' Notice of Election to Decline Intervention, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Jun. 27, 2014) (Dkt. 19) | SA1–4 |
| Order, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Jun. 27, 2014) (Dkt. 94) | SA5–6 |
| *Excerpts from* Second Amended Complaint, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Jul. 6, 2016) (Dkt. 101) | SA7–11 |
| *Excerpts from* Memorandum Opinion, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Jul. 26, 2016) (Dkt. 103) | SA12–23 |
| *Excerpts from* Exhibit A to Relator's Mtn. for Leave to file Supplement to Second Amended Complaint, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Jul. 6, 2016) (Dkt. 174-2) | SA24–37 |
| *Excerpts from* Relator's Response in Opposition to EHR's Motion for a Court Order Requiring the Production of Relator's CMS Employment Records by Relator and CMS, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Spt. 13, 2018) (Dkt. 257) | SA38–40 |
| Order, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Feb. 21, 2019) (Dkt. 400) | SA41–42 |
| United States' Motion to Dismiss Relator's Third Amended Complaint, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Aug. 20, 2019) (Dkt. 526) | SA43–44 |
| Order, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Sep. 26, 2019) (Dkt. 550) | SA45–47 |
| *Excerpts from* Final Memorandum Opinion, *U.S. ex rel. Polansky v. Exec. Health Res. Inc.*, No. 2:12-cv-439 (E.D. Pa. Nov. 5, 2019) (Dkt. 561) | SA48–52 |
| *Excerpts from* Relator's Opposition to Defendants' Motion to Dismiss (Dkt. 80) | SA53–65 |

| | |
|---|---|
| *Excerpts from* Reply in Support of the Defendants' Motion to Dismiss (Dkt. 84) | SA66–69 |
| *Excerpts from* March 7, 2025, Transcript of Proceedings — Oral Argument (Dkt. 96) | SA70–85 |



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVA]

PLAINTIFFS UNDER SEAL, :
:
v. :
:
DEFENDANTS UNDER SEAL. :

**Civil Action No. 12-CV-4239**

### FILED UNDER SEAL

### THE UNITED STATES' NOTICE OF
### ELECTION TO DECLINE INTERVENTION

**ZANE DAVID MEMEGER**
**United States Attorney**

**MARGARET L. HUTCHINSON**
**Assistant United States Attorney**
**Chief, Civil Division**

**ERIC D. GILL**
**Assistant United States Attorney**
**615 Chestnut Street, Suite 1250**
**Philadelphia, PA 19106**
**215-861-8250**
**215-861-8618 (Fax)**

**SA1**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| THE STATE OF CALIFORNIA, THE STATE OF | ) | |
| COLORADO, THE STATE OF CONNECTICUT, | ) | |
| THE STATE OF DELAWARE, THE DISTRICT | ) | |
| OF COLUMBIA, THE STATE OF FLORIDA | ) | |
| THE STATE OF GEORGIA, THE STATE OF | ) | |
| HAWAII, THE STATE OF ILLINOIS, THE STATE | ) | |
| OF INDIANA, THE STATE OF IOWA, THE | ) | |
| STATE OF LOUISIANA THE STATE OF | ) | |
| MARYLAND, THE COMMONWEALTH OF | ) | |
| MASSACHUSETTS, THE STATE OF MICHIGAN | ) | |
| THE STATE OF MINNESOTA, THE STATE OF | ) | |
| MONTANA, THE STATE OF NEVADA THE | ) | |
| STATE OF NEW HAMPSHIRE, THE STATE | ) | |
| OF NEW JERSEY, THE STATE OF | ) | |
| NEW MEXICO, THE STATE OF NEW YORK, | ) | |
| THE STATE OF NORTH CAROLINA, THE | ) | |
| STATE OF OKLAHOMA, THE STATE OF | ) | |
| RHODE ISLAND, THE STATE OF TENNESSEE | ) | |
| THE STATE OF TEXAS, THE COMMONWEALTH | ) | |
| OF VIRGINIA, THE STATE OF WASHINGTON, | ) | |
| THE STATE OF WISCONSIN, | ) | Case No. 12-CV-4239 |
| *ex rel.* JESSE POLANSKY, M.D., M.P.H., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EXECUTIVE HEALTH RESOURCES, INC., | ) | |
| UNITED HEALTH GROUP INCORPORATED, | ) | |
| UNITED HEALTHCARE SERVICES, INC., | ) | |
| OPTUM, INC., OPTUMINSIGHT HOLDINGS LLC, | ) | |
| OPTUMINSIGHT, INC., COMMUNITY HOSPITAL | ) | |
| OF THE MONTEREY PENINSULA, and | ) | |
| YALE-NEW HAVEN HOSPITAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' NOTICE OF ELECTION
## TO DECLINE INTERVENTION

Pursuant to the False Claims Act, 31 U.S.C. § 3730 (b)(4)(B), the United States notifies

**SA2**

the Court of its intention not to intervene in this action.[1]

Although the United States declines to intervene, we respectfully refer the Court to the False Claims Act, which allows the relator to maintain the action in the name of the United States, providing, however, that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1) (emphasis added). Any dismissal should be without prejudice to the United States.

Therefore, the United States requests that, should either the relator or the defendants propose that this action be dismissed, or otherwise discontinued, the Court first solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730 (c)(3), the United States requests that all Orders of the Court and pleadings filed in this action be served upon the United States. The United States also requests that it be served with all notices of appeal. The United States reserves its right to order any deposition transcripts and to intervene in this action at a later date for good cause.

Finally, the United States requests that only the Second Amended Complaint, including exhibits, and this notice be unsealed, which relator should serve upon the defendants. All other contents of the Court's file in this matter (including, but not limited to, any motions filed by the United States for an extension of the sixty-day investigative period or for any other reason)

---

[1] The named state co-plaintiffs do not intend to intervene in this action and they have authorized the United States to communicate that to the Court. The state co-plaintiffs concur in the lifting of the seal as to the Second Amended Complaint and agree to the dismissal of this civil action should the relator elect to do so.

The Maryland False Health Claims Act provides that "If the State does not elect to intervene and proceed with the action…before unsealing the complaint, the court shall dismiss the action." Md. Code Ann., Health Gen. § 2-604(a)(7). Accordingly, the State of Maryland requests that all claims asserted on behalf of the State of Maryland be dismissed without prejudice.

2

**SA3**

should remain under seal because in discussing the content and extent of the United States'

investigation, such papers are provided by law to the Court alone for the sole purpose of

evaluating whether the seal and time for making an election to intervene should be extended.

    A proposed order accompanies this notice.

Dated: June 27, 2014

Respectfully submitted,

**STUART F. DELERY**
Assistant Attorney General

**ZANE DAVID MEMEGER**
United States Attorney

**MARGARET L. HUTCHINSON**
Assistant United States Attorney
Chief, Civil Division

By:

**ERIC D. GILL**
**VIVECA D. PARKER**
Assistant United States Attorneys

**MICHAEL D. GRANSTON**
**TRACY L. HILMER**
**RENEE S. ORLEANS**
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261
Washington, D.C. 20044
Telephone: (202) 514-4504

3

**SA4**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. ex rel. JESSE POLANSKY, M.D., M.P.H. | : : : | CIVIL ACTION NO. 12-4239 |
| v. | : : | **FILED** |
| EXECUTIVE HEALTH RESOURCES, INC., et al. | : : : | MAY 1 0 2016 |
| | : | MICHAEL E. KUNZ, Clerk<br>By _____ Dep. Clerk |

**ORDER**

AND NOW, this 10th day of May, 2016, upon consideration of defendant Executive

Health Resources, Inc.'s motion to dismiss relator's second amended complaint (Dkt. No. 52,

Ex. A), defendants UnitedHealth Group, Inc., United HealthCare Services, Inc., Optum, Inc., and

OptumInsight, Inc.'s motion to dismiss (Dkt. No. 51), defendants Yale-New Haven Hospital,

Inc. and Community Hospital of the Monterey Peninsula's motion to dismiss (Dkt. No. 90),

relator Jesse Polansky's opposition briefs (Dkt. No. 62, attached briefs) and the parties'

supplemental briefs (Dkt. Nos. 70, 78, 84 and 89), and consistent with the accompanying

Memorandum of Law, it is ORDERED that:

1. Relator's claims under the New Mexico Medicaid False Claims Act in Counts

    XLVII and XLVIII of his second amended complaint (Dkt. No. 12) are

    DISMISSED without prejudice pursuant to Federal Rule of Civil Procedure

    41(a)(1);

2. Executive Health Resources, Inc.'s motion is GRANTED to the extent that

    relator's remaining state law claims against it are DISMISSED with leave to

    amend. Executive Health Resources, Inc.'s motion is DENIED in all other

    respects; and

3. UnitedHealth Group, Inc., United HealthCare Services, Inc., Optum, Inc., and

**SA5**

OptumInsight, Inc.'s motion to dismiss is GRANTED and relator's remaining claims against them are DISMISSED with leave to amend; and

4.    Yale-New Haven Hospital, Inc. and Community Hospital of the Monterey Peninsula's motion to dismiss is GRANTED and relator's claims against them are DISMISSED with leave to amend.

Relator Jesse Polansky may file an amended complaint on all claims that he has not voluntarily dismissed by June 13, 2016 to the extent that he can plead sufficient facts upon which to do so.

It is FURTHER ORDERED that, because this Order and the accompanying Memorandum of Law may contain confidential information, they have been filed under seal pending review by the parties to permit the parties to meet and confer and propose a single jointly redacted version of the Order and the accompanying Memorandum of Law.  On or before June 13, 2016, the parties shall provide the Court with any proposed redacted Order and accompanying Memorandum of Law or shall inform the Court that no redactions are required. The parties shall also advise the Court of any further action to be taken, if any, before a publicly-available version of this Order and the accompanying Memorandum of Law may be issued.

_T. N. O'Neill_

THOMAS N. O'NEILL, JR., J.

**SA6**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE DISTRICT OF COLUMBIA, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, and THE STATE OF WISCONSIN *EX REL.*[UNDER SEAL], | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | Civil Action No. 12-cv-4239 <br><br> Filed In Camera And Under Seal In Accordance With The False Claims Act, 31 U.S.C. § 3730(b)(2) <br><br> Do Not Place In Press Box <br> Do Not Enter on PACER <br><br> Jury Trial Demanded |
| Plaintiffs, | : : : | |
| v. | : : : | |
| [UNDER SEAL], | : : | |
| Defendants. | : : : : : : : : : | |

FILED

MAR 25 2014

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

**SECOND AMENDED COMPLAINT**

**SA7**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | : | Civil Action No. 12-cv-4239 |
| THE STATE OF CALIFORNIA, THE | : | |
| STATE OF COLORADO, THE STATE OF | : | Filed In Camera And Under Seal In |
| CONNECTICUT, THE STATE OF | : | Accordance With The False Claims Act, |
| DELAWARE, THE DISTRICT OF | : | 31 U.S.C. § 3730(b)(2) |
| COLUMBIA, THE STATE OF FLORIDA, | : | |
| THE STATE OF GEORGIA, THE STATE | : | Do Not Place In Press Box |
| OF HAWAII, THE STATE OF ILLINOIS, | : | Do Not Enter on PACER |
| THE STATE OF INDIANA, THE STATE | : | |
| OF IOWA, THE STATE OF LOUISIANA, | : | Jury Trial Demanded |
| THE STATE OF MARYLAND, THE | : | |
| COMMONWEALTH OF | : | |
| MASSACHUSETTS, THE STATE OF | : | |
| MICHIGAN, THE STATE OF | : | |
| MINNESOTA, THE STATE OF | : | |
| MONTANA, THE STATE OF NEVADA, | : | |
| THE STATE OF NEW JERSEY, THE | : | |
| STATE OF NEW MEXICO, THE STATE | : | |
| OF NEW YORK, THE STATE OF NORTH | : | |
| CAROLINA, THE STATE OF | : | |
| OKLAHOMA, THE STATE OF RHODE | : | |
| ISLAND, THE STATE OF TENNESSEE, | : | |
| THE STATE OF TEXAS, THE | : | |
| COMMONWEALTH OF VIRGINIA, THE | : | |
| STATE OF WASHINGTON, and THE | : | |
| STATE OF WISCONSIN *EX REL.* JESSE | : | |
| POLANSKY, M.D., M.P.H., | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| EXECUTIVE HEALTH RESOURCES | : | |
| INC., UNITEDHEALTH GROUP | : | |
| INCORPORATED, UNITED | : | |
| HEALTHCARE SERVICES, INC., | : | |
| OPTUM, INC., OPTUMINSIGHT | : | |
| HOLDINGS, LLC, OPTUMINSIGHT, INC., | : | |
| COMMUNITY HOSPITAL OF THE | : | |
| MONTEREY PENINSULA, and YALE- | : | |
| NEW HAVEN HOSPITAL, INC., | : | |
| Defendants. | : | |

## SECOND AMENDED COMPLAINT

**SA8**

**TABLE OF CONTENTS**

I.   SUMMARY OF THE ACTION..................................................................   3

II.  JURISDICTION AND VENUE..............................................................   4

III. PARTIES..........................................................................................   5

IV.  THE STATUTORY AND REGULATORY FRAMEWORK...........................   9

     A.   The Federal False Claims Act (FCA) (31 U.S.C. § 3729 *et seq.*)...............   9

     B.   The Medicare & Medicaid Programs..............................................   12

     C.   The Amount Hospitals Are Reimbursed By Medicare And Medicaid
          For Medical Services Is Materially Impacted By Whether The Patient
          Is Classified As *Inpatient* Or *Outpatient* Status ...................................   17

          1.   The difference between inpatient and outpatient observation services   17

          2.   Hospitals generally receive higher reimbursements from Medicare
               and Medicaid for care provided to a patient classified as *inpatient*
               than for care provided to a patient classified as *outpatient* .............   24

     D.   The Attending Physician's Initial Inpatient/Outpatient Decision And
          The Hospital's Review ...........................................................   25

     E.   The Government Has Stepped-Up Its Scrutiny Of Hospitals' Practices
          Concerning The Classification Of Medicare And Medicaid
          Beneficiaries As Inpatient Rather Than Outpatient Status........................   27

V.   FACTUAL ALLEGATIONS..................................................................   29

     A.   EHR Background ..................................................................   29

          1.   EHR holds itself out as an "expert" on inpatient vs. outpatient status   29

          2.   EHR asserts that physicians are incapable of determining proper
               hospital status ................................................................   32

          3.   EHR advises hospitals that by engaging EHR to perform
               second level reviews they are effectively shielding themselves
               from liability if the claims are later denied ...............................   33

i

**SA9**

B.    EHR's Fraudulent Scheme To Generate Higher Medicare And
      Medicaid Reimbursements For Hospitals By Converting Large
      Volumes Of Cases That Fail The Utilization Management Criteria
      For Inpatient Status To Inpatient Claims ……………….....……………….    37

      1.    EHR's case review criteria violate CMS's requirements……………    44

            a.    *EHR's case review criteria fail to address CMS's
                  24-hour benchmark* ……………………………….……………    44

            b.    *EHR's case review criteria disregard the fact that
                  observation services are intended for patients whose
                  clinical trajectory is uncertain* …………………………..…..    44

            c.    *EHR's case review criteria fail to await the results of pivotal    45
                  diagnostic studies before determining inpatient status* ………..

            d.    *EHR misleadingly instructs its physician advisors that
                  observation services constitutes a lesser intensity of care*…...    47

      2.    EHR's case review criteria lack scientific integrity …………...…….    50

            a.    *Flawed integration of patient risk assessment tools into
                  the EHR Logic* ………………………………………………………    50

            b.    *EHR's case review criteria are over-inclusive checklists
                  of risk factors* …………………………………………………...…    50

            c.    *EHR has not validated the utility of its ECG criteria in    50
                  predicting length of stay* ………………………..……………….

            d.    *EHR's fraudulent case review criteria for chest pain*……..…    53

      3.    EHR provides false inpatient certifications for numerous types of    58
            outpatient surgical procedures………………………………………..

      4.    EHR told a family of hospitals that it would focus on
            assigning surgical "procedures that tend to have shorter stays"
            to inpatient status …………………………………………………    63

      5.    EHR's lucrative appeals business………………………………………    64

            *EHR's fraudulent Medicaid appeals* ……………………………….....    67

      6.    EHR internal documents reveal intense discussions about the
            integrity of EHR's hospital certification program……………………...    68

ii

**SA10**

C.     EHR Is Causing Hospitals Across America To Present False
       Inpatient Claims……………………………………….………………….…     70

       *EHR's Own Documents Substantiate The Pivotal Role Its False
       Certifications Routinely Play In Dramatically Increasing Inpatient
       Hospital Claims Payments……………………..…………………………..*     74

D.     Yale-New Haven Hospital Knowingly Presented Fraudulent Inpatient
       Claims To The Government Payers…………………………………..……     81

E.     Community Hospital of the Monterey Peninsula Knowingly Presented
       Fraudulent Inpatient Claims To The Government Payers…………………     87

F.     The UHG Defendants Know Of Or Are Recklessly Disregarding EHR's
       Fraudulent Scheme………………………………………………………....     91

VI.    COUNTS………………………………………………………………………..    106

VII.   REQUESTS FOR RELIEF……………………………………………………..    181

VIII.  DEMAND FOR JURY TRIAL………………………………………………….    182

iii

**SA11**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | : | CIVIL ACTION |
| ex rel. JESSE POLANSKY, M.D., M.P.H. | : | NO. 12-4239 |
| | : | |
| v. | : **FILED** |
| | : | |
| EXECUTIVE HEALTH RESOURCES, | : MAY 1 0 2016 | |
| INC., et al. | : | |
| | MICHAEL E. KUNZ, Clerk | |
| O'NEILL, J. | By_____Dep. Clerk | May 10, 2016 |

## MEMORANDUM

Relator Jesse Polansky brings this qui tam action against defendants Executive Health
Resources, Inc. (EHR), UnitedHealth Group, Inc. (UHG), United HealthCare Services, Inc.
(UHCS), Optum, Inc., OptumInsight, Inc., Yale-New Haven Hospital, Inc. (YNHH) and
Community Hospital of the Monterey Peninsula (CHOMP). Relator brings his claims on behalf
of the United States, twenty-eight states and the District of Columbia pursuant to the False
Claims Act (FCA), 31 U.S.C. §§ 3729, et. seq., and analogous state laws.

Before me are defendants' three motions to dismiss relator's second amended complaint[1]
(Dkt. No. 12) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b): one by EHR (Dkt.
No. 52, Ex. A), one by UHG, UHCS, Optum and OptumInsight (Dkt. No. 51) and one by
defendant hospitals YNHH and CHOMP (Dkt. No. 90). Also before me are relator's opposition
briefs (Dkt. No. 62, attached briefs) and the parties' supplemental briefs (Dkt. Nos. 70, 78, 84
and 89). For the reasons that follow, I will grant in part and deny in part EHR's motion, grant
YNHH and CHOMP's motion and grant UHG, UHCS, Optum and OptumInsight's motion.

---

[1]      Because no prior filings have addressed relator's previous complaints, unless
otherwise specified any reference to relator's complaint below refers to his second amended
complaint.

**SA12**

the requirements of dozens of particular state Medicaid programs.[27] Therefore, I will dismiss

relator's state law claims against EHR on this basis, with leave to amend if he can sufficiently

allege falsity under the relevant state FCAs.

## II. Defendants CHOMP and YNHH[28]

Hospital defendants YNHH and CHOMP have moved to dismiss relator's complaint on

several grounds. They argue that relator has failed to plead fraud with particularity for either

defendant, that relator has failed to plead the falsity element required for FCA claims[29] and that

relator has failed to adequately plead knowledge. Relator argues that he has established all of

these elements. For the following reasons, I will grant CHOMP and YNHH's motion to dismiss

all of relator's claims against them.

### A. 9(b)

CHOMP and YNHH first argue that relator has failed to plead fraud with particularity as

required by Federal Rule of Civil Procedure 9(b). The Court of Appeals has explained that to

---

[27]     Relator also pleads that "the various state Medicaid programs will only cover services provided to beneficiaries where such services are reasonable and necessary and provided, billed, and paid in the most economical manner." Dkt. No. 12 at ¶ 62. However, without addressing the merits of this basis for legal falsity, I note that these provisions could only assist relator in pleading falsity if states allege certain distinctions between inpatient and outpatient services, which relator has not sufficiently pled at this stage.

[28]     Relator brings claims against YNHH and CHOMP under sections 3729(a)(1)(A)-(B) of the FCA and under analogous provisions of state FCAs. Dkt. No. 12 at ¶¶ 282, 296, 307, 317, 337, 347. Relator argues in a footnote in his response brief that even though he has not specifically alleged violations of section 3729(a)(1)(G), "it is clear from the allegations in the [c]omplaint that the hospital defendants also violated" this provision. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 13. Contrary to relator's assertion, relator's sixty-six count complaint, in which each count alleges claims under specific provisions in each FCA and against specific defendants, does not make it "clear" that he brings a claim under this provision of the FCA. Relator's contention that his complaint is similar to complaints without specified counts of statutory violations or a complaint in which a claim for breach of contract could also be seen to encompass a claim for fraud when read as a whole is unavailing.

[29]     I have already responded to CHOMP and YNHH's falsity arguments in my discussion of falsity above addressing EHR's motion. Thus, I have found that relator sufficiently pleads falsity.

43

**SA13**

satisfy Rule 9(b)'s particularity requirement at the pleadings stage, an FCA claimant may identify "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia, 754 F.3d at 155-56 (internal citations omitted). An FCA claimant need not plead "the exact content of the false claims in question" to survive a motion to dismiss based on Rule 9(b). Id. at 156. Relator argues that he has alleged particular details of schemes by both defendants and provided reliable indicia that lead to a strong inference that the hospitals submitted false claims.

Relator's claims against CHOMP center on its involvement with EHR beginning in September 2007. See Dkt. No. 12 at ¶¶ 220, 226. Basing his allegations on a slide presentation by CHOMP,[30] relator maintains that EHR provided second level reviews for CHOMP's cases starting in September 2007 and alleged that in its first year working with EHR, "EHR helped CHOMP increase its revenue by $6.7 million." See id. at ¶¶ 226-29.

He alleges that in that first year, EHR advised CHOMP that inpatient certification was the proper admissions status in 1,419 of 1,741 cases in which a CHOMP physician deemed an admission inpatient but that failed an internal screening by the hospital's first level review team. Dkt. No. 12 at ¶ 227. Relator also alleges that CHOMP "referred to EHR a large number of cases that it had previously billed as outpatient because they had failed" CHOMP's internal review criteria, leading EHR to certify 95% of these claims as inpatient admissions. Dkt. No. 12 at ¶ 228. Relator does not provide any additional details about the submission of these claims after EHR's certifications. Relator does not make any other time-specific allegations about

---

[30] At numerous points in its motion to dismiss and reply brief, CHOMP makes reference to contents within the slide presentation that relator does not cite in his complaint, asking me to use its contents to rebut relator's arguments. See Dkt. No. 90 at 50. Because I find relator's complaint deficient on other grounds, I need not rely on the contents of the slide presentation to dismiss relator's claim.

44

**SA14**

CHOMP's involvement with EHR beyond 2008.

Relator's scant allegations against CHOMP are insufficient to meet the particularity requirements of Rule 9(b). CHOMP argues that relator needs to plead information about the actual patients underlying the claims, but relator need not plead "the exact content of the false claims in question" to survive a motion to dismiss based on Rule 9(b). Foglia, 754 F.3d at 156. However, relator's complaint includes numerous allegations discussing multiple hospitals other than CHOMP where EHR performed second level reviews and certified a large number of the cases it reviewed as inpatient, where its certifications were allegedly determinative of the billing outcome. See Dkt. No. 12 at ¶ 193-94. Allegations that could be applied to any of EHR's clients paired with two vague sets of cases EHR reviewed for CHOMP sometime in 2007 or 2008 are not sufficient to plead with particularity CHOMP's involvement in EHR's fraudulent scheme for nearly a decade.

Regarding YNHH, relator contends that YNHH contracted with EHR for second level reviews of cases that failed their internal review criteria for inpatient status from 2008 until "at least February 2012." Id. at ¶ 204. Relator also contends that the Associate Chief Medical Director and Care Coordinator from YNHH and the Executive Vice Present of EHR were all speakers at a case management conference in September 2009. Id. at ¶ 205. These are relator's sole allegations against YNHH prior to a government audit in December 2011. To support his claim, relator relies on his description of EHR's scheme overall to allege that "YNHH knew, or was severely reckless in not knowing, that the cases did not satisfy the Medicare and Medicaid rules and regulations for inpatient status." Id. at ¶ 206.

Relator alleges that on December 16, 2011, YNHH was subjected to a government audit for its inpatient admissions and retroactively denied "20 out of the 20 cases" the auditors

**SA15**

reviewed, where relator believes that "EHR had provided inpatient certifications to YNHH for these cases." Id. at ¶ 207. Relator provides examples of two of these retroactively denied claims. Id. at ¶ 208. YNHH was informed of the results of the audit and on an unspecified date and time between December 2011 and January 2012, unspecified officials from YNHH "expressed concern to EHR about whether EHR's reviews were compliant with Medicare and Medicaid rules and regulations." Id. at ¶¶ 209-10. YNHH was allegedly "so concerned" that someone from YNHH indicated to EHR in January 2012 "that there was a significant risk that YNHH would terminate its contract with EHR." Id. at ¶ 210. EHR's CCO allegedly tried to convince YNHH to continue using their services. Id. at ¶ 211. Relator then concludes that because "at the time [he] departed EHR in February 2012, YNHH was still using EHR to perform a second level review of cases that fail [internal criteria] for inpatient status" YNHH must have continued to contract with EHR after that time. Id. at ¶ 212.

Relator's allegations against YNHH can be broken into three time periods: before the audit in December 2011, between December 2011 and February 2012 when relator left EHR and after February 2012. Relator's allegations before the audit amount to YNHH contracting with EHR, paired with examples of two undated cases retroactively denied in the audit. Although relator has laid out EHR's scheme in detail, relator does not provide sufficient factual allegations that YNHH submitted false claims during the entire period between 2008 and December 2011, and the undated audit period does not therefore provide reliable indicia of when false claims may have been submitted.

During the period between December 2011 and February 2012, relator alleges that by January 2012 YNHH was seriously considering terminating its contract with EHR although EHR continued conducting second level reviews for YNHH. YNHH's continued contract with EHR

46

**SA16**

during this time period is not paired with reliable indicia that false claims were submitted during this time period, when YNHH was allegedly questioning its relationship with EHR. For the time period after February 2012, relator provides no factual allegations about YNHH, merely assuming that YNHH continued to use EHR's services after February 2012 to allege violations "from at least 2008 continuing through the present." See Dkt. No. 12 at ¶¶ 284, 298. Relator has failed to meet Rule 9(b)'s pleading requirements with respect to its allegations against YNHH.[31]

**B.  12(b)(6)[32]**

YNHH and CHOMP additionally argue that relator has not sufficiently pled that either defendant knowingly participated in EHR's alleged scheme. Relator argues that he has sufficiently pled that both YNHH and CHOMP knowingly submitted false claims. Knowledge is a required element of relator's claims under the pre- and post-FERA versions of the FCA. See 31 U.S.C. § 3729(a)(1)-(2) (2008); 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA defines "knowingly," both before and after the FERA, as when "a person, with respect to information — 1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," without requiring "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Allegations of knowledge may be alleged generally and need not be pled with particularity. Fed. R. Civ. P. 9(b).

---

[31] YNHH and CHOMP also argue that relator's complaint fails to plead fraud with particularity because relator does not provide any examples of false Medicaid claims and because relator does not identify which California or Connecticut statutes, regulations or guidance that these defendants could have violated. See Dkt. No. 90 at 37, 39-40. I need not address this alternate argument because relator has failed to meet the standards of Rule 9(b) on other grounds.

[32] Although I have already held that relator's complaint fails under Rule 9(b), I will also analyze the sufficiency of relator's complaint under Rule 12(b)(6).

47

**SA17**

## 1.    CHOMP

CHOMP argues that relator does not plausibly allege its knowledge of the submission of false claims. Dkt. No. 90 at 49. CHOMP contends that all of relator's allegations against it are based on a publicly accessible slide presentation from which relator has pulled quotes out of context. Id. at 50-52. CHOMP maintains that relator's argument that it knew about any false claims is at odds with relator's detailed allegations that EHR deceived hospitals into thinking that their internal review criteria were incorrect and were resulting in lost revenue for hospital clients. Id. at 52. Additionally, CHOMP argues that EHR's decision not to share its case review criteria with a client like CHOMP is not a reason to impute its knowledge of EHR's scheme since otherwise "every person who used a product created by a process that the manufacturer protected as a trade secret would have to suspect illegality." Id. at 53.

Relator maintains that he has pled CHOMP's knowledge of alleged false claims for three reasons. First, relator argues that CHOMP at the very least acted in reckless disregard of allegedly false claims certified by EHR because it "wholly outsourced its hospital status billing decisions to EHR." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 86. However, as CHOMP points out, relator's allegations acknowledge that for at least the time period at issue cases were only sent to EHR after an internal review team screened an inpatient recommendation from a patient's physician. See Dkt. No. 12 at ¶ 226. Without more, this fact alone does not support relator's argument that CHOMP knew about EHR's alleged fraudulent scheme.

Next, relator argues that CHOMP recklessly disregarded fraud when it "relied upon EHR without knowing what framework and criteria EHR was applying to decide how the hospital would bill Medicare" for claims because CHOMP had an obligation to know how EHR was reviewing its claims. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 86-87. Relator

48

**SA18**

argues that "[b]illing for inpatient claims based upon EHR's inpatient certifications without knowing any details of [EHR's review criteria] is the epitome of willful blindness." Id. at 88. Relator relies on a compliance workbook which suggests that hospitals be aware of their admission screening criteria to argue that CHOMP knowingly submitted inaccurate inpatient claims. Id. at 88.

CHOMP argues that the advice of this handbook, which does not appear to be used in any payment review decisions, does not "demand that EHR reveal its specific criteria" and that regardless, this handbook was created by a private entity and does not impose a legal requirement on CHOMP. Dkt. No. 89 at 27-28. Additionally, CHOMP notes relator's extensive allegations explaining how EHR advertises itself as the national expert in compliance review with extensive support for their decisions and a high success rate on appeals. Id. at 28. Thus, the only authority relator relies on appears to be a privately-created, non-regulatory document that is not used in review decisions. Relator's allegations of how EHR represents its services to clients contradict relator's assertion of CHOMP's knowledge. CHOMP's use of EHR's services without knowing its review criteria is insufficient to adequately plead its knowledge of fraud.

Finally, relator argues that "CHOMP ignored glaring red flags that [EHR's review criteria' was causing the hospital to submit false inpatient claims." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 88. Relator maintains that the high rate of inpatient certifications by EHR in the two alleged sets of claims "should have caused CHOMP to question EHR's compliance with Medicare and Medicaid rules and regulations" because CHOMP was obligated to understand conditions of payment. Id. Relator argues that CHOMP uses its internal review guidelines when it is helpful for it, only seeking second level review by EHR when claims fail internal guidelines for inpatient admissions. Id. at 89.

49

**SA19**

CHOMP maintains that the rate of EHR's inpatient certifications that failed internal review criteria does not imply any knowledge of fraud because his notice allegation is "a legal conclusion derived from the factual allegations his pleading makes regarding the percentage of disagreement." Dkt. No. 89 at 29. CHOMP argues that assuming its knowledge of EHR's alleged fraudulent certifications stands completely at odds with relator's allegations that EHR "goes to great lengths to cause hospitals to believe that [their internal review criteria] are extremely inaccurate" and that "EHR misrepresents to prospective clients that [one set of review criteria] 'rarely qualifies' cases for inpatient status and that therefore, a second level physician review by EHR is essential for 'revenue integrity.'" See Dkt. No. 12 at ¶ 87. Additionally, CHOMP argues that under relator's allegations, EHR only reviews cases once a CHOMP physician has recommended inpatient admission. Dkt. No. 89 at 30. Paired with EHR marketing of CHOMP's internal review criteria as extremely inaccurate, this review process after a physician recommends inpatient admission makes high disagreement rates with internal criteria seem like a logical outcome rather than demonstrating CHOMP's knowledge of fraud. Thus, relator has failed to allege CHOMP's knowledge sufficiently to plead an FCA claim against CHOMP.

### 2. YNHH

YNHH also argues that relator has failed to plead its knowledge of a fraudulent scheme. Relator argues that he has sufficiently alleged knowledge both before and after the December 2011 government audit of YNHH. YNHH argues that relator "provides no factual allegations to justify his assertion that [YNHH] knowingly submitted false claims prior to the [December 2011] audit." Dkt. No. 90 at 53-54. YNHH also argues that even after the audit, "EHR went to great lengths to instill doubt in hospitals regarding the validity of such audits" and "allegedly

50

**SA20**

overstated its high level of success in appealing claim denials resulting from such audits." Dkt.
No. 90 at 54, citing Dkt. No. 12 at ¶¶ 87, 173.

Relator responds that he has adequately pled knowledge both before and after the YNHH
audit. Before the audit, relator supports his allegations with the argument that YNHH "has a
history of billing Medicare for services that were not medically necessary or for which it was
otherwise not entitled to reimbursement." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and
CHOMP at 80. Relator contends that his factual allegations of settlements that YNHH made
with the government for alleged FCA violations in 2008 and 2009 support his allegations of
YNHH's knowledge. See Dkt. No. 12 at ¶ 217. However, as YNHH notes, settlements are not
adjudications on the merits of FCA actions against YNHH. See Dkt. No. 89 at 31. These
settlements were unrelated to inpatient admission billing and relator does not allege a connection
to EHR.

Relator also relies on "YNHH's sophistication with respect to the inpatient vs. outpatient
determination" to support his knowledge allegations. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH
and CHOMP at 84. Relator supports this argument with his allegation that two YNHH officials
spoke at a September 2009 case management conference that involved discussion of compliance
issues given government audits of short stays and observation status. See Dkt. No. 12 at ¶ 205.
Additionally, relator argues that YNHH employees "were at least on notice of" a program in
Connecticut in December 2009 held to educate Connecticut hospitals and others about
"compliant determination of hospital status for chest pain." Dkt. No. 62, Rel.'s Br. Opp. EHR,
YNHH and CHOMP at 84, citing Dkt. No. 12 at ¶ 147. However, combined with relator's
allegations about how extensively EHR worked to convince hospitals that their internal review
criteria were incorrect and that EHR had a high appeal success rate, these allegations are

51

**SA21**

insufficient to establish knowledge from 2008 until the 2011 audit.

Relator also makes allegations about a 2012 Medicare Appeals Council decision and a 2014 HHS report reviewing YNHH inpatient claims from before the audit in his brief to support his knowledge argument. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 80-82. As these allegations are absent from his complaint, I cannot consider them. See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal citations omitted). Additionally, as YNHH argues, given relator's allegations of EHR's misrepresentations about its success appealing claim denials, "[a] Council decision affirming a claim denial is completely consistent with [r]elator's central legal theory that EHR duped hospitals into believing that claim denials were often incorrect and that EHR could successfully appeal such denials." Dkt. N. 89 at 33.[33]

After the audit, relator argues that he has alleged actual knowledge of the submission of false claims. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 84. He alleges that YNHH continued contracting with EHR through at least after EHR's CCO told an unidentified person at YNHH that "even though the government may reject inpatient claims that EHR certifies through probe and audit functions, the Government Payers will pay a substantially greater percentage without ever reviewing them, resulting in YNHH receiving millions more in reimbursements than it would without EHR." Dkt. No. 12 at ¶ 211. He also argues that EHR at least acted with reckless disregard after YNHH learned the results of the audit because twenty out of the twenty inpatient claims reviewed were retroactively denied. Id. at ¶ 207.

---

[33]     YNHH also argues that relator's reliance on the 2012 decision implicates the public disclosure bar, but I need not address this argument as I find that relator's allegations from before the audit are insufficient to establish knowledge on other grounds.

52

**SA22**

YNHH argues that YNHH's knowledge of the audit alone is insufficient to allege knowledge of fraudulent claims because of relator's allegations about EHR's misrepresentations about its success on appeal and the validity of audits. Dkt. No. 90 at 54. I agree. Yet, EHR's CCO's alleged statements to YNHH go to the heart of the alleged scheme and relator has therefore sufficiently pled YNHH's knowledge of the scheme from the time when the communication occurred — sometime after January 2012 — onward. Rather than touting EHR's success rates or disparaging faulty audits, the alleged statement communicated to YNHH that it should keep working with EHR because enough claims would evade review to recoup any losses from claims denied in audits or on appeal. Thus, relator has sufficiently pled YNHH's knowledge of the scheme from the date of this communication onward. However, because I have found that relator has failed to plead fraud with particularity against YNHH, all claims against YNHH both before and after the audit must be dismissed.[34]

## III. Defendants UHG, UHCS, Optum and OptumInsight

Defendants UHG and its subsidiaries, UHCS, Optum and OptumInsight have moved to dismiss all of relator's claims against them on several grounds. UHG and its subsidiaries argue that relator "fails to allege adequately that any of [them] caused the submission of false claims or participated in the creation of a false record" or that piercing the corporate veil is appropriate to hold them liable as EHR's parent companies. Dkt. No. 51 at 1. Relator maintains that he has

---

[34]      EHR argues that dismissing relator's claims against YNHH and CHOMP necessarily requires dismissing relator's claims against EHR for those cases it participated in reviewing at YNHH and CHOMP that allegedly led to the filing of false claims because relator's theory of liability against EHR is predicated on its "causing" the submission or use of false claims by hospitals. See Dkt. No. 78 at 3 n.3. Relator's failure to sufficiently allege particularized details of YNHH and CHOMP's involvement in EHR's scheme prevents holding them liable on the basis of relator's complaint. However, EHR may still be liable for FCA violations regardless of the liability of its client hospitals. As the parties have not addressed this point further, at this stage I decline to dismiss relator's claims against EHR of alleged FCA violations resulting from EHR's reviews of admissions decisions at CHOMP and YNHH.

53

**SA23**

# Exhibit A

# Proposed Supplement to Second Amended Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE DISTRICT OF COLUMBIA, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, and THE STATE OF WISCONSIN *EX REL.* JESSE POLANSKY, M.D., M.P.H., | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | Civil Action No. 12-cv-4239 <br><br> **PUBLIC REDACTED VERSION** <br><br> Jury Trial Demanded |
|                                    Plaintiffs, | : : | |
|                            v. | : : : | |
| EXECUTIVE HEALTH RESOURCES INC., UNITEDHEALTH GROUP INCORPORATED, UNITED HEALTHCARE SERVICES, INC., OPTUM, INC., OPTUMINSIGHT HOLDINGS, LLC, OPTUMINSIGHT, INC., COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA, and YALE-NEW HAVEN HOSPITAL, INC., | : : : : : : : : : | |
|                      Defendants. | : | |

**SUPPLEMENT TO RELATOR'S SECOND AMENDED COMPLAINT**

<u>**TABLE OF CONTENTS**</u>

SUPPLEMENTAL ALLEGATIONS ................................................................................... 1

    A.    Dr. Polansky's subsequent employment and his knowledge of
           EHR's ongoing fraudulent hospital status certification scheme. ................ 1

    B.    EHR's business practices since 2012. .......................................................... 4

    C.    EHR's response to the August 2013 codification of CMS's
           longstanding requirements for determination, certification, billing,
           and payment for hospital status in the Two-Midnight Rule. ...................... 9

    D.    EHR caused Holy Spirit Health System to submit false and
           fraudulent inpatient claims to Medicare, and directly submitted
           false claims to Medicare through the appeals process. ............................. 14

    E.    EHR caused Summit Health to submit false and fraudulent
           inpatient claims to Medicare and submitted false claims directly to
           Medicare through the appeals process. ...................................................... 24

    F.    EHR's inpatient certifications and related risk-based arguments
           continue to be appealed by EHR and are uniformly rejected at the
           highest level of administrative review. ...................................................... 26

    G.    Recent Government enforcement efforts demonstrate the
           materiality of EHR's violations. ............................................................... 30

    H.    EHR's fraudulent scheme is ongoing. ...................................................... 33

**SA26**

and latent past medical history and existing low-probability risk factors as opposed to factors directly and significantly related to the determination of anticipated length of stay, and continue to be based, instead, on the scientifically invalid application of medical evidence.  The sole purpose of the "EHR Logic" continues to be to convert vast numbers of cases that fail the hospitals' UM criteria into inpatient status, in order to drive the revenue-cycle expectations of the hospitals' financial leadership.

**D.    EHR caused Holy Spirit Health System to submit false and fraudulent inpatient claims to Medicare, and directly submitted false claims to Medicare through the appeals process.**

32.    Holy Spirit Health System ("Holy Spirit") is an integrated health system focused centered on a community hospital of approximately 300 beds located near Harrisburg, Pennsylvania.[7]  Holy Spirit was one of EHR's oldest clients, and had contracted with EHR since at least 2007 to provide hospital status reviews for its Medicare cases, and also to handle its appeals from Medicare denials of inpatient claims.  Holy Spirit had a standard EHR implementation, under which it sent all Medicare cases that failed initial InterQual screening for inpatient status to EHR for review.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████  Holy Spirit terminated its contract with EHR in November 2016.

33.    ████████████████████████████████████████

████████████████████████████  ██  ████████████████████

---

[7] Holy Spirit Health System is now Geisinger Holy Spirit, a part of the Geisinger Health System. *See* https://www.geisinger.org/patient-care/find-a-location/geisinger-holy-spirit.

[8] Dr. Polansky reviewed this document during his employment at Holy Spirit between December 2013 and May 2014.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

                  ████████████████████████████████

              ██████████████████████████

              ████████████████████████████████

34.    As previously discussed in the Second Amended Complaint (2AC ¶ 190(b)), EHR provides its client hospitals with reports tracking the rates at which treating physicians write hospital status orders that comport with EHR's certifications, as well as identifying cases and physicians that deviate. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ ██████ ████████████

_____

[9] Generally, EHR physician are required to contact the treating physician only in one of two circumstances:  (1) the physician had written an outpatient order and EHR wanted it changed to inpatient; or (2) the physician had written an inpatient order but EHR needed more information in order to support its own certification of the case as inpatient.  EHR does not contact the treating physician when the physician wrote an inpatient order for a case that failed UM criteria and EHR has certified inpatient status.  Normally, failing a hospital's UM review would result in the claim being billed as observation and outpatient.  However, in this very frequent situation, EHR typically



35. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

These reports, which EHR provides to its client hospitals' senior management, achieves the intended impact of pressuring the treating physicians to accept EHR's inpatient certifications – even if that requires them to change their own initial orders or pressures them to write inpatient orders that violate Medicare requirements.

36.     This process, as implemented at Holy Spirit, was EHR's standard practice. With rare exception, EHR's certifications were determinative of billing status for Holy Spirit, just as they are for most EHR client hospitals. *See* 2AC ¶ 190(b). As explained in the Second Amended Complaint (2AC ¶¶ 72–73), Medicare requires hospitals to maintain a process (typically carried out by a "Utilization Review" or "UR" Committee) to review cases to ensure that inpatient orders meet Medicare hospital status requirements. *See* 42 C.F.R. § 482.30. However, during the period of Dr. Polansky's employment, Holy Spirit did not maintain a functioning UR Committee. Instead, Holy Spirit effectively delegated the UR Committee's oversight and review functions to EHR's

---

does not attempt to contact the treating physician to explain why the case has unique characteristics justifying inpatient status, but simply proceeds to certify the case as inpatient.    The majority of these cases are false claims.

physician advisors, who made the final decisions on hospital status. It is a condition of payment that the ultimate decision regarding hospital status is made by the hospital's physician, not a third party. *See* MBPM, ch. 1 § 10; 42 C.F.R. § 482.12(c)(2); 42 C.F.R. § 412.3.

37. As discussed in Section A above, Dr. Polansky was employed by Holy Spirit as its Chief Physician Advisor from December 2013 through May 2014. Dr. Polansky's duties involved leading efforts to ensure that Holy Spirit correctly assigned hospital status (*i.e.*, inpatient vs. outpatient) for billing purposes. In the course of this work, Dr. Polansky had full access through EHR's "EHR Portal" to the records for all the Medicare cases EHR had handled for Holy Spirit from 2007 up through May 2014, including appeals, as well as to the full range of documents and communications (promotional materials, analytic reports, etc.) that EHR typically provides to its client hospitals. In addition, Dr. Polansky was tasked with reviewing EHR's performance under its contract with Holy Spirit. In the course of that work, Dr. Polansky conducted a detailed retrospective review of short-stay medical and minor procedure cases which EHR had certified as inpatient. The cases reviewed by Dr. Polansky represented time periods both before and after CMS's August 2013 adoption of the Two-Midnight Rule.

38. Based on Dr. Polansky's experience, only a small proportion of cases that fail initial UM Criteria (InterQual and/or Milliman) screening meet Medicare requirements for inpatient billing. However, at Holy Spirit, Dr. Polansky learned that during the twelve month period ending January 31, 2014, EHR certified inpatient status for *78%* of Medicare cases that had initially failed InterQual screening. The vast majority of these cases should not have been classified and billed as inpatient hospital cases under applicable CMS regulations and guidance criteria. Medicare required these cases to be classified and billed (at most) as outpatient hospital cases, which meant substantially lower reimbursement payments to the hospitals.

39.    At Holy Spirit, as at other EHR client hospitals, EHR provided an online "Dashboard" through which a hospital could easily track the total numbers of cases referred to EHR and the numbers and percentages of those cases that EHR certified as inpatient, on a yearly or monthly basis. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████  █████████████████████████████████

████████████████████████

40.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

41.    ████████████████████████████████████████

████████████████████████████████████████████

42.     The following example is illustrative of the false EHR certifications Dr. Polansky

reviewed at Holy Spirit:

43.

───────────────────────

[10] Dr. Polansky became aware of this patient for the first time in 2014 in conjunction with his review of EHR's reviews, certifications, and appeals for Holy Spirit.

44. ████████████████████████████████████████

████████████████████████████████    ████████████

████████████████████████████████████████

████████████████████████

45.     EHR provided an inpatient certification on May 8, 2012, and Holy Spirit billed the claim for inpatient services to Medicare, with the result that EHR's false certification caused Holy Spirit to submit a false claim for inpatient services from Medicare.[11]

46.     Dr. Polansky was not the only member of Holy Spirit's executive staff to question recognize the falsity of EHR's certifications.  Dr. Polansky, as part of his responsibilities, discussed  EHR certifications that illustrated his concerns about EHR's violations of Medicare requirements with the hospital's Chief Medical Officer, Chief Compliance Officer, and ultimately with the Chief Financial Officer.  During a February 19, 2014 discussion of an EHR certification for a Medicare patient with chest pain, the Chief Medical Officer commented that the EHR inpatient certification was "useless" and that EHR created "more compliance risk in this case" than the entirety of another billing program also known to be a compliance risk.  Similarly, the Chief Compliance Officer stated that she did not "see anything acute" (i.e., warranting inpatient status

---

[11] As described in the Second Amended Complaint (2AC ¶ 45), in seeking reimbursement from Medicare for these false claims described in this Supplement, on each occasion the hospital submitted Form CMS-1450 falsely certifying that, among other things: (1) "the billing information as shown on the face hereof is true, accurate and complete"; and (2) "the submitter did not knowingly or recklessly disregard or misrepresent or conceal any material facts."  It is also a condition of payment that the ultimate decision is made by the hospital's physician, not by a third party.  *See* MBPM, ch. 1 § 10; 42 C.F.R. § 482.12(c)(2); 42 C.F.R. § 412.3.  EHR's certifications were also material to – in fact, determinative of – the claims submitted by the hospitals.

in the case under discussion), and that she understood why her colleagues (i.e., compliance officers at other hospitals) were "all cancelling EHR contracts," specifically mentioning Dr. Polansky's future employer, Summit Health. .

47.     Holy Spirit organized an in-person meeting between EHR and Holy Spirit's medical affairs and compliance leadership in order to address Holy Spirit's detailed concerns about case review and appeals decision making at EHR.  A meeting was finally scheduled for March 7, 2014, with EHR representatives Joe Manno (EHR's account management executive for Holy Spirit), Joseph Vissoni, MD (an EHR Senior Team Lead), and Christine Duffy, RN (EHR Manager of Client Services).  The agenda for the meeting included a detailed review of EHR's inpatient certifications for a range of specific medical and minor surgical cases, as well as a discussion of EHR's interpretation of the Two-Midnight Rule.  However, EHR abruptly cancelled this meeting without explanation just minutes before its scheduled time, when the EHR team was already in Holy Spirit's parking lot.  Dr. Polansky believes EHR's senior management called off this meeting because they did not want to risk being asked to explain their overarching failure to meet Medicare requirements before and after the Two Midnight Rule, or to explain in detail the regulatory and medical basis for a range of specific Holy Spirit medical and minor surgical cases that had been assembled and pre-reviewed by Holy Spirit and a third-party advisor.

48.     Dr. Polansky subsequently met with Holy Spirit's Chief Financial Officer, who had initiated the EHR contract, to discuss his detailed analysis regarding the compliance and financial risk posed to Holy Spirit by continuing to bill hospital inpatient claims based on EHR's certifications. The meeting also discussed Dr. Polansky's ongoing concerns about allowing EHR to submit appeals to Medicare for Holy Spirit cases.  The analysis Dr. Polansky presented to the CFO included results of a review of EHR's certifications that had been reviewed by Holy Spirit's

Chief Medical Officer in conjunction with a third party utilization management organization, as well the substantial volume of EHR appeals delayed by the Medicare appeals backlog. In November 2016, 18 months later, Holy Spirit terminated its contract with EHR.

49.    In the course of his work at Holy Spirit, Dr. Polansky also reviewed numerous cases in which EHR handled administrative appeals on behalf of Holy Spirit for inpatient claims that had been denied by Medicare.[12] Dr. Polansky concluded that many of EHR's appeal submissions were false and misleading, for several reasons:

    a.    EHR's appellate arguments for both medical and minor procedure focus entirely on latent risk, disregarding CMS's standard of a "reasonable" expectation of an extended need for hospital services beyond two midnights.

    b.    EHR uses standardized, boilerplate arguments for each case category rather than having a physician with detailed knowledge of the patient's clinical status create a customized argument based on his or her clinical knowledge and judgment.

    c.    EHR's "expert evidence-based" (i.e. scientifically based) appeals arguments include specific citations from reputable journal articles. In fact, many of these

---

[12] In the spring of 2014, Dr. Polansky wrote an e-mail to Holy Spirit's management cautioning them not to take comfort in the accuracy of EHR's certifications merely because EHR had secured favorable decisions from Administrative Law Judges overturning claim denials in a handful of cases. At a subsequent meeting, Holy Spirit's executives told Dr. Polansky that they agreed with him and that they were considering having an independent third party re-review hundreds of appeals to gather additional intelligence about the integrity of EHR's hospital status decisions and subsequent decisions to appeal cases, and to estimate the potential budgetary shortfall associated with withdrawing millions of dollars' worth of appeals stuck in the Medicare appeals backlog.

arguments in EHR's boiler plate language are false and misleading representations of the information and conclusions resident in the medical literature. These distortions are essential to EHR's agenda to violate Medicare requirements as part of its false review framework designed to assign high risk status to patients as the justification for inpatient status.

50.     As discussed in Section F below, a review of published decisions shows that EHR's inpatient certifications have been rejected without exception at the highest level of administrative review before the Medicare Appeals Council.

51.     Based on Dr. Polansky's review, from at least 2007 up through at least May 2014, with rare exceptions, Holy Spirit accepted all of EHR's inpatient certifications and billed those claims to Medicare as inpatient.  This was confirmed by Holy Spirit's Director of Hospitalists, who told Dr. Polansky on February 19, 2014 that "we follow EHR recs 100% of the time – they are the experts."  She also told Dr. Polansky that her hospitalist team did not have concerns about deferring to EHR's expertise in assigning hospital status because it did not impact the care of the patient.

52.     By furnishing Holy Spirit with false inpatient certifications that it knew Holy Spirit would use as a basis to submit claims that do not meet the Medicare inpatient requirements as inpatient claims, EHR knowingly caused Holy Spirit to present false claims for payment to Medicare.

53.     In seeking reimbursement from Medicare for these false claims, on each occasion Holy Spirit submitted Form CMS-1450 falsely certifying that, among other things:

   •    "the billing information as shown on the face hereof is true, accurate and complete"; and

• "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

54.    Moreover, EHR made a false statement (namely, its certification of inpatient status) that was material – and indeed determinative – to the false claims that Holy Spirit submitted for payment to the Government and that ultimately were paid by the Government.

55.    In addition, EHR also presented false claims and made false statements directly to the Government, when it presented and argued appeals of Holy Spirit claims that had been denied payment.

56.    All of the false and fraudulent statements discussed herein are material to the Government's decision to pay because they were capable of influencing or did influence the Government's decision to pay, both individually and in the aggregate.

**E.    EHR caused Summit Health to submit false and fraudulent inpatient claims to Medicare and submitted false claims directly to Medicare through the appeals process.**

57.    Summit Health ("Summit") is an integrated health system that includes two acute care hospitals (with approximately 300 total beds) near Chambersburg, Pennsylvania.  Between April/May 2015 and August 2015, Summit was a client of EHR and had contracted with EHR handle inpatient/outpatient determinations for all of its Medicare cases.[13]  Summit's practice was to send all Medicare cases that failed initial InterQual screening for inpatient status to EHR for

_____

[13] By the time Dr. Polansky joined Summit in April 2015, Summit was considering giving notice to EHR that it did not intend to renew its contract.  However, during the time period Dr. Polansky worked at Summit the contract was still in effect, and EHR was still handling hospital status determinations for Summit's Medicare and Medicaid cases.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, EX REL. JESSE POLANSKY, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 12-CV-4239 |
| v. | : : | |
| EXECUTIVE HEALTH RESOURCES INC., | : : | |
| Defendant. | : : : : : | |

**RELATOR'S RESPONSE IN OPPOSITION TO EHR'S MOTION FOR A COURT ORDER REQUIRING THE PRODUCTION OF RELATOR'S CMS EMPLOYMENT RECORDS BY RELATOR AND CMS**

**SA38**

Relator respectfully responds to EHR's Motion For A Court Order Requiring The Production of Relator's CMS Employment Files By Relator And CMS (D252).[1]

**<u>INTRODUCTION</u>**

The Court should deny EHR's Motion for discovery of records which are protected by a binding settlement agreement (the "Settlement Agreement") between Relator and his former employer, the Centers for Medicare and Medicaid Services ("CMS"). The strict confidentiality obligations imposed by that Agreement prohibit both Relator and CMS from disclosing the records at issue or revealing information about the specific terms or underlying subject matter of the settlement without a court order.[2] EHR has failed to make the particularized showing required by the courts of this District for discovery relating to confidential settlement agreements; the vast majority of the documents covered by the Settlement Agreement are protected by CMS's deliberative process privilege; and the expungement of records from Relator's personnel file pursuant to the Settlement Agreement constitutes good cause for protecting those records from discovery and renders them likely to be inadmissible at trial.

Accordingly, Relator respectfully requests that the Court either (1) deny EHR's Motion, or alternatively (2) order that Relator submit the Settlement Agreement and a representative

---

[1] Contemporaneously with the filing of this Response, Relator is also filing a Motion for Protective Order with respect to the discovery materials that are the subject of EHR's Motion.

[2] As Relator has made clear to EHR, Relator has already produced all responsive, non-privileged documents concerning his former employment by CMS that are ***not*** subject to the terms of the Settlement Agreement, without conceding the legal "relevance" of any such documents (*see, e.g.*, Ex. A, May 29, 2018 Letter from Walker p.4; EHR Mot. Ex. 8, August 30, 2018 Letter from Walker). Thus, the only remaining documents at issue are those that fall squarely within the scope of the Settlement Agreement and its confidentiality obligations.

document illustrating the nature of the settled disputes to the Court for in-camera review prior to any further ruling on the Motion.

## BACKGROUND

Before he worked for EHR, Relator was employed by CMS from 2003 to 2011 in various leadership positions (D12, 2d Amd. Compl. ¶ 10). In connection with his departure from CMS, Relator and CMS negotiated and executed the Settlement Agreement, which resolved and settled all outstanding disputes between Relator and CMS by mutual agreement. Pursuant to the Agreement, records relating to the underlying disputes resolved by the settlement were expunged by CMS from Relator's Official Personnel Folder.

As Relator has explained to EHR, the Settlement Agreement imposes strict confidentiality obligations that restrict Relator from disclosing its specific terms absent a court order. Nevertheless, Relator has attempted in good faith to provide EHR with as clear an explanation as possible – within the limits imposed by the Agreement – regarding the basis for Relator's objection to the discovery requested by EHR.[3] To that end, Relator reached out to CMS in an effort to obtain clarification regarding how much information Relator could provide EHR about the terms of the Settlement Agreement (Walker Dec. ¶ 4; EHR Mot. Ex. 2 (July 6, 2018 Letter from Walker); *id*. Ex. 4 (July 9, 2018 E-mail from Walker)). However, this effort was complicated by the fact that the Settlement Agreement only allows for its provisions to be disclosed to specific persons within

---

[3] *See* Declaration of Chad Walker ¶¶ 2–3; Ex. B, March 19, 2018 Letter from Walker, p.3 (explaining Relator's objections to EHR's Interrogatory No. 12); Ex. C, March 28, 2018 Letter from Walker (following up on March 22, 2018 meet and confer call); Ex. A, May 29, 2018 Letter from Walker p.4 (explaining that Relator cannot disclose specific language from the Settlement Agreement absent court order); *id*. Ex. 8 (August 30, 2018 Letter from Walker further explaining Relator's position).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| JESSE POLANSKY M.D., M.P.H., et al. | CIVIL ACTION |
|---|---|
| v. | NO. 12-CV-4239 |
| EXECUTIVE HEALTH RESOURCES, INC., et al. | |

## ORDER

**AND NOW** this 21st day of February, 2019, following a hearing on February 19, 2019, the Court made a number of findings of fact and rulings on the transcript which will not be repeated and it is further **ORDERED**:

1.      Defendant's Motion for Relief (ECF 322) and for Sanctions (ECF 373) will be **GRANTED** in part and **DENIED** in part.

2.      Defendant shall promptly submit its Request for Attorney's Fees and Costs, limited to preparation of the briefs on the above Motions, but not including any time for the review of any underlying documents, to Plaintiff promptly, for discussion between counsel.  If there is no agreement, Defendant shall file its Motion for Attorney's Fees and Costs no later than March 8, 2019.  Plaintiff shall respond within 14 days.

3.      A Memorandum will be filed in due course on the topic of sanctions.

4.      Plaintiff's Motion to Seal or for Redaction of the Record (ECF 294 and 369) is **DENIED**.

5.      Defendant's Motion to Quash as to depositions (ECF 355) is **GRANTED**.

6.      Following extensive discussion about the Government's possible claim of deliberative privilege, the Court noted its reluctance to find any such privilege exists as to any of the documents that were the subject of the Motion for Sanctions, specifically the 14,000 documents on the DVD possessed by Plaintiff, being at least seven years old.  As the

**SA41**

Government is claiming the privilege, it has the burden of proving that the privilege applies.  The

Court considers with favor the proposal by defense counsel as to a "claw back" procedure.  The

Court will require the U.S. Attorney's Office and/or CMS to file a final determination by the

Government on as to Defendant's access to the 14,000 documents, no later than March 8, 2019.

The parties can reply within seven (7) days.

       7.     Defendant may continue with discovery as discussed but the Court views March

30, 2019 as a reasonable termination of all fact discovery by the Defendant.

**BY THE COURT:**

**/s/ Wendy Beetlestone for:**

_____

**MICHAEL M. BAYLSON**
**United States District Court Judge**

O:\CIVIL 12\12-4239 Polansky v Exec Health Resources\12cv4239 order 02192019.docx

**SA42**

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, <br> *ex rel.* JESSE POLANSKY, M.D., M.P.H., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: <br> 12-CV-4239-MMB |
| v. | ) ) ) | |
| EXECUTIVE HEALTH RESOURCES, INC., | ) ) | |
| Defendant. | ) ) ) | |

## THE UNITED STATES' MOTION TO DISMISS RELATOR'S THIRD AMENDED COMPLAINT

Pursuant to 31 U.S.C. § 3730(c)(2)(A), the United States hereby moves to dismiss all remaining claims in the Third Amended Complaint brought on behalf of the United States by Relator Jesse Polansky, M.D., M.P.H. (relator) under the False Claims Act, 31 U.S.C. § 3729, *et seq.* (FCA). As discussed in the accompanying Memorandum of Law in Support of the United States' Motion to Dismiss Relator's Third Amended Complaint, the FCA permits the United States to dismiss a *qui tam* action where, as here, further litigation by a relator would result in imposing significant costs and burdens on the government and waste precious judicial and governmental resources. Accordingly, the United States requests that all FCA claims be dismissed with prejudice as to relator and without prejudice to the United States.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM M. McSWAIN
United States Attorney
Eastern District of Pennsylvania

*s/ Charlene Keller Fullmer*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*s/ Viveca D. Parker*
VIVECA D. PARKER
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 861-8443
Email: Viveca.Parker@usdoj.gov

*s/ Renée S. Orleans*
ANDY J. MAO
Acting Director
ALLISON CENDALI
Assistant Director
RENÉE S. ORLEANS
Trial Attorney
Civil Division,Commercial Litigation Branch
Fraud Section
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 514-4504
Email: Renee.Orleans@usdoj.gov

*Attorneys for the United States of America*

Dated:  August 20, 2019

**SA44**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| JESSE POLANSKY M.D., M.P.H., et al. | CIVIL ACTION |
|---|---|
| v. | NO. 12-CV-4239 |
| EXECUTIVE HEALTH RESOURCES, INC., et al. | |

## <u>ORDER</u>

**AND NOW,** this 26th day of September, 2019, following a hearing on the United States'

Motion to Dismiss this case, and consideration of the arguments on behalf of the Plaintiff/Relator,

Defendant, and United States, the Court has determined the procedure to be followed:

1.      Considering the provisions of FED. R. CIV. P. 56(f) entitled "Judgment Independent

of the Motion,"[1] the Court will consider whether to grant summary judgment in favor of Defendant

under the recent Supreme Court decisions in <u>Escobar</u>, 136 S. Ct. 1989 (2016), <u>Allina</u>, 139 S. Ct.

1804 (2019), <u>PDR</u>, 139 S. Ct. 2051 (2019), and any lower court decisions subsequent to these

decisions.

2.      Counsel for Plaintiff/Relator and Defendant shall submit briefs limited to how the

claims by Plaintiff/Relator in this case may be affected by these decisions.  The Court will consider

the material facts as stated in Plaintiff's Third Amended Complaint (ECF 428 Ex. A),[2] considered

in the light most favorable to the Plaintiff, and the following undisputed facts:

---

[1] <u>See also</u> <u>Forrest v. Parry</u>, 930 F.3d 93, 110-11 (3d Cir. 2019) ("It is well-settled that [under FED. R. CIV. P. 56(f)] district courts may grant summary judgment <u>sua sponte</u>, so long as the losing party is given notice when summary judgment is being contemplated.").
[2] The Third Amended Complaint, attached as Exhibit A to Plaintiff's Motion for Leave to Amend Third Amended Complaint, was deemed filed by the Court on May 10, 2019.  (ECF 433.)

1

a. As to Plaintiff's Phase I claims, an overriding undisputed fact is that the Medicare/Medicaid regulations relied upon by Plaintiff/Relator were not promulgated pursuant to notice and hearing.

b. As to the "Two Midnight Rule" regulations, although promulgated after notice and hearing, Plaintiff/Relator has asserted that Defendant continued the same procedures and practices under the Two Midnight Rule that it had followed under Phase I. (ECF 533, Pl.'s Opp'n to Government's Mot. to Dismiss Third Am. Compl., at 29-30.)

3. Plaintiff/Relator and Defendant shall submit a brief limited to these issues, limited to 20 pages, double-spaced, by 4:00 p.m. on Friday, October 11, 2019.

a. Although the Court does not believe any exhibits are necessary to decide this issue, either party may cross-reference briefs and exhibits already filed in the case, without refiling, or submit new exhibits but only if they are relevant to the issues raised by these decisions, also within fourteen (14) days.

4. The Government may file a brief, limited to 20 pages, also by 4:00 p.m. on Friday, October 11, 2019, stating in more detail the reasons for its motions to dismiss focused on the substantive merits of Plaintiff/Relator's claims.

5. The stay of proceedings shall be suspended only for the filing of these briefs but will otherwise remain in effect.

6. The Government's Motion to Dismiss will be held under advisement pending the filing of briefs required by this Order, and a decision by the Court on the issues raised in the Order.

**SA46**

7.     In the event the Court denies summary judgment on either or both of Plaintiff/Relator's claims, the Court may invoke 28 U.S.C. § 1292(b) to request the Third Circuit to accept an interlocutory appeal.

**BY THE COURT:**

**/s/ Michael M. Baylson**

_____

**MICHAEL M. BAYLSON, U.S.D.J.**

O:\CIVIL 12\12-4239 Polansky v Exec Health Resources\12cv4239 order 09252019.docx

**SA47**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JESSE POLANSKY M.D., M.P.H., et al.<br><br>v.<br><br>EXECUTIVE HEALTH RESOURCES, INC., et al. | CIVIL ACTION<br><br>NO. 12-CV-4239 |

<u>**FINAL MEMORANDUM**</u>

Baylson, J.                                                          **November 5, 2019**

## I.   INTRODUCTION

Jesse Polansky ("Relator") brings this False Claims Act <u>qui tam</u>[1] action on behalf of the United States alleging that Executive Health Resources, Inc. ("Defendant") caused its client hospitals to fraudulently bill Medicare and Medicaid by falsely designating patient admissions as inpatient when they should have been marked as outpatient.

This case, which was filed over seven years ago, has an extensive procedural history. Presently before the Court is the Government's Motion to Dismiss, as well as the briefs submitted by the parties following the Court's Order of September 26, 2019, (ECF 550), invoking FED. R. CIV. P. 56(f) and giving notice of possible entry of summary judgment on other grounds.

---

[1] The False Claims Act was "originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." <u>United States v. Bornstein</u>, 423 U.S. 303, 309 (1976).  The <u>qui tam</u> provision of the False Claims Act permits "a private person, known as a relator, … [to bring an action] 'for the person and for the United States Government … in the name of the Government.'" <u>Cochise Consultancy, Inc. v. Hunt</u>, 139 S. Ct. 1507, 1510 (2019) (quoting 31 U.S.C. § 3730(b)).

**SA48**

## II.    BACKGROUND

### A.  Case History[2]

Relator filed his Complaint under seal on July 26, 2012 in accordance with the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.  (ECF 1.)  Relator twice amended his Complaint, (ECF 9; ECF 12) before the Government declined to intervene on June 27, 2014, (ECF 19.)  Thereafter, pursuant to the FCA, Relator served the then-operative Complaint on Defendant and proceedings commenced before the Honorable Thomas O'Neill, who issued an extensive Memorandum and Order denying the Defendant's Motion to Dismiss on July 26, 2016.  (ECF 103.)  The following year, after Judge O'Neill's death, the case was transferred to the undersigned.  (ECF 141.)

The core of Relator's theory of liability is that Defendant exploited the difference in reimbursement rates for inpatient and outpatient services,[3] causing hundreds of thousands of claims for medical services to be billed as inpatient when they should have been billed as outpatient.[4]  It became obvious to the Court, and was not seriously contested by Relator or Defendant, that the best way to adjudicate this case was to hold a bellwether trial on a limited number of claims.[5]  Following multiple submissions and conferences, the Court entered an order

---

[2] Unless the name of the docket entry is relevant to this Memorandum, the Court will refer to docket entries solely by their assigned number.

[3] According to Relator, "Medicare generally pays about $4,500-$5,000 more for inpatient services … than it does when the same services are provided to a patient classified as outpatient observation."  (ECF 429, Ex. A., Third Am. Compl. ¶ 66) ("Third Am. Compl.").

[4] For a comprehensive description of the scheme, see Polansky v. Exec. Health Res., Inc., 196 F. Supp. 3d 477, 484-88 (E.D. Pa. 2016) (O'Neill, J.).  As summarized by Judge O'Neill, there are two potential levels of review for a physician's initial determination of whether a patient should be classified as inpatient or outpatient.  At the first level, a review is conducted by an internal hospital committee using standard industry criteria.  Id. at 485.  If the internal committee determines that a patient does not qualify for inpatient designation, many hospitals then have a physician advisor, such as Defendant, conduct a second level review.  Id.  After physician advisor review, the hospital—not the physician advisor—submits the claim for reimbursement to Medicare or Medicaid.  (Am. Compl. ¶ 115.)  Relator alleges that Defendant, as a physician advisor conducting second level reviews (i.e., reviewing the determination of the internal review committee that a patient does not qualify for inpatient status), "knowingly misconstrue[d] … regulations when … review[ing] hospital admission determinations, fraudulently certifying 'thousands upon thousands of cases' for hospitals to submit to Medicare and Medicaid as inpatient claims rather than outpatient as appropriate."  Polansky, 196 F. Supp. 3d at 485.

[5] See generally MELISSA J. WHITNEY, BELLWETHER TRIALS IN MDL PROCEEDINGS: A GUIDE FOR TRANSFEREE JUDGES (2019).

**SA49**

requiring the parties to select a limited number of claims for discovery, following which a smaller number of claims would be selected for a bellwether trial. (ECF 240.) The Court eventually held that each party would select specified claims for itself and other claims would be chosen randomly for discovery. This procedure was designed to result in a jury trial where the jury would answer interrogatories as to whether Relator had proven Defendant violated the FCA by seeking and accepting improper reimbursements, and the Court would enter judgment on all other claims encompassed by the jury verdict after the bellwether trial.

For pretrial management, the case was divided into two segments. The first segment, "Phase I," was designed to adjudicate reimbursement claims certified by Defendant from January 1, 2009 to October 1, 2013.[6] The second segment, the "Two Midnight" phase, was designed to address Relator's reimbursement claims for events that occurred after October 1, 2013, on which date the Centers for Medicare and Medicaid Services ("CMS") implemented a new reimbursement regime—the Two Midnight Rule.[7] In short, the Two Midnight Rule requires that, to admit an individual as an inpatient, the admitting physician expects that the patient's stay will cross two midnights.[8]

Extensive discovery proceeded with several motions filed by both parties, which the Court attempted to resolve fairly and promptly.[9] During the course of this discovery, Relator's conduct

---

[6] Relator seeks to prove liability for Phase 1 certifications that meet the following criteria:
　　"(a) For beneficiaries whose length of stay after the inpatient admission was (1) day or less; and
　　 (b) The medical record does not demonstrate that there was a reasonable basis at the time of the inpatient order for the treating physician to expect a medically necessary hospital stay of 24 hours or longer."
(Third Am. Compl. ¶¶ 364; 379.)
[7] After a notice and comment period, CMS published the final version of the Two Midnight Rule on August 19, 2013, effective beginning October 1, 2013. Two Midnight Rule, 78 Fed. Reg. 50,496 (Aug. 19, 2013) (codified as amended 42 C.F.R. § 412.3(d)(1)).
[8] The full Regulation reads: "[A]n inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights." 42 C.F.R. § 412.3(d)(1).
[9] On February 21, 2019, the Court appointed a Special Master—Sandra Jeskie, an expert on electronically stored information ("ESI")—to oversee discovery issues. (ECF 399.) The majority of discovery that has been conducted to date dealt with Relator's Phase 1 claims, though some discovery has been taken on the Two Midnight claims as well.

3

**SA50**

interrupted the intended discovery; his behavior was material and plays a role in the final disposition of this case.

First, Relator belatedly revealed that he located a DVD disk in his personal possession containing approximately 14,000 documents. Relator testified about this discovery and the surrounding circumstances on January 15, 2019, (ECF 357), but the Court found that he was not completely credible. Relator's counsel admitted that a large number of the documents contained on the disk were relevant to Phase I. The unearthing of the disk caused a disruption in the proceedings. The Court allowed for discovery on the circumstances under which the DVD was found and why the documents on it, at least those relevant to this case, had not been turned over. Defendant subsequently moved for sanctions, which the Court granted in part. (ECF 400.)

Second, Relator unilaterally purported to change the settled method for selection of claims that had been painstakingly arrived at after several pretrial conferences without offering any explanation as to why he failed to seek court approval. This attempted change was never satisfactorily explained by Relator. See ECF 460, June 26, 2019 Memorandum at 2 (warning that Relator's actions "may have significance in future Court rulings in this case").[10]

These two events—the revelation of Relator's DVD disk and Relator's attempt to change the selection of cases for the bellwether trial—caused serious prejudice to Defendant and unnecessary delays in pretrial proceedings.

---

[10] Dismissal of all or part of Relator's claims may be appropriate as a sanction for his conduct. The Third Circuit requires that a district court considering dismissal to sanction a discovery violation balance six factors: "(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense." Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984). The Court is not satisfied that the Poulis factors warrant dismissal.

4

and after the Department of Justice investigated the allegations … and declined to intervene" demonstrated lack of materiality).

The Third Circuit recognized that "[b]ecause the False Claims Act was passed to protect the federal treasury, … and since the Government decides on payment, … it is the <u>Government's</u> materiality decision that ultimately matters." <u>Petratos</u>, 855 F.3d at 492 (emphasis added). Because the Government's actions—declining to intervene or take other action against Defendant, moving to dismiss Relator's case entirely, and continuing to pay claims—signal that they do not view the alleged conduct to be material, summary judgment on the Two Midnight claims may be appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss is **GRANTED**.  The Court also finds that, independent of dismissal based on the Government's motion, summary judgment is properly granted to Defendant on the Phase 1 claims.

An appropriate order follows.

O:\CIVIL 12\12-4239 Polansky v Exec Health Resources\12cv4239 Final Memorandum re Govt MTD, SJ Arguments.docx

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel*. JESSE M. POLANSKY, M.D., M.P.H.,<br><br>                         Plaintiffs,<br><br>v.<br><br>GEISINGER HOLY SPIRIT; GEISINGER COMMUNITY MEDICAL CENTER; GEISINGER MEDICAL CENTER; SPIRIT PHYSICIAN SERVICES INC.<br>                         Defendants. | Docket No. 1:20-cv-00599-CCC<br><br>Leave to File Excess Pages Granted |

**<u>Relator's Opposition to Defendants' Motion to Dismiss</u>**

**SA53**

defendants knowingly submitted false claims, as he alleges here.  *See Galmines*, 2013 WL 2649704, at *9.

The *EHR* case also alleges nothing about the Geisinger defendants' decision to adopt EHR's methodology for cases that were not sent to EHR, or ***anything*** related to Spirit Physician Services's bonus scheme.  Those are entirely different fraudulent schemes, which fall outside the first-to-file bar.  *Id.* at *10 (holding that the first-to-file bar does not apply to a different scheme).

### 2. The first-to-file bar does not apply because Dr. Polansky amended his complaint after *EHR* was dismissed.

Even if the Court does find that this case alleges the same material elements as the *EHR* case, the first-to-file bar does not apply where, as here, a relator files an amended complaint when the earlier action is no longer pending.

The *EHR* case was decided by the United States Supreme Court on June 16, 2023, and the case was closed on September 12, 2023.  *EHR* Case ECF No. 576.  It is non-controversial that a suit is no longer pending once it is dismissed.  *See Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, 575 U.S. 650, 663 (2015) (holding that "a *qui tam* suit under the FCA ceases to be 'pending' once it is dismissed").  Polansky filed his amended complaint on April 29, 2024, after the *EHR* case was dismissed and no longer pending.  The first-to-file bar does not apply, then, because Polansky filed his operative complaint after the *EHR* case was no longer pending.

As the First Circuit explained in *United States ex rel. Gadbois v. PharMerica Corp.*, this result flows directly from Federal Rule of Civil Procedure 15. 809 F.3d 1, 4 (1st Cir. 2015). In *Gadbois*, relator filed his first complaint while a related action was pending, and the district court held that the first-to-file rule blocked his complaint. *Id.* at 3. While that dismissal was on appeal, the related action settled and was dismissed. *Id.* at 4. Relator then moved to amend his complaint, arguing that the amendment cured any potential first-to-file bar. *Id.*

The First Circuit agreed. *Id.* at 5. It began by recognizing that Rule 15 allows supplementation "'even though the original pleading is defective in stating a claim or defense.'" *Id.* at 5, *quoting* Fed. R. Civ. P. 15(d). Because Rule 15 allows supplementation to cure a defective complaint, an amended complaint cures any potential defect with a complaint that would otherwise fall under the first-to-file bar. *Id.* (holding that an amended complaint "dissolved the jurisdictional bar that the court below found dispositive").

The Third Circuit has adopted *Gadbois'* reasoning that a Rule 15 amendment can cure defects in original complaints. *See Garrett v. Wexford Health*, 938 F.3d 69, 83 (3d Cir. 2019), *citing Gadbois*, 809 F.3d at 5. Likely for that reason, courts in this circuit have likewise held that an amended False Claims Act complaint, filed when an otherwise related action is no longer pending, is not subject to the first-to-file bar. *See, e.g.*, *United States ex rel. Brown v. Pfizer, Inc.*, 2017 WL 1344365, at

*3 (E.D. Pa. Apr. 12, 2017) ("Like the facts in *Gadbios*, the pending *Worsfold* case was dismissed, and therefore was no longer 'pending' for purposes of the first-to-file rule under the FCA."); *United States v. Cephalon, Inc.*, 159 F. Supp. 3d 550, 558 (E.D. Pa. 2016) ("I find that it would be unjust to require relators to refile their claims even though their only procedural roadblock was dismissed over two years ago and they have amended their complaint since then.").

Because Dr. Polansky amended his complaint after the *EHR* case was dismissed, the first-to-file bar is inapplicable even if the Court finds that it is a related action under Section 3730(b)(5).[2]

### 3. The first-to-file bar does not apply to Dr. Polansky's Stark Act claims.

Even if the first-to-file rule applies to Dr. Polansky's allegations regarding inpatient hospital admission, that same prohibition would not apply to Dr. Polansky's Stark Act claims. The first-to-file bar is not applied on an entire-action basis, but instead is applied claim-by-claim. *See U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000) (Alito, J.) ("[W]hen it is asserted that a later-filed complaint contains claims that are based on the facts underlying certain claims in a pending multi-count complaint, the court must conduct a claim-by-claim

---

[2] Courts in certain jurisdictions take a different approach, but the Third Circuit has, consistent with *Gadbois*, held that Rule 15 amendments cure pleading defects. Dr. Polansky's amended complaint—undisputedly filed when no action was pending that could have created a first-to-file bar—cures any such defect here.

judgment, in the alternative, on some of Dr. Polansky's claims there, because as Geisinger concedes, "the Third Circuit found that it did not need to reach the district court's summary judgment decision and ultimately vacated the district court's opinion and order as to summary judgement." MTD 57 at n. 13, *citing Polansky v. Exec. Health Res. Inc*, 17 F.4th 376, 382 (3d Cir. 2021).[3]

Even setting that aside, collateral estoppel applies only to the issues that were actually litigated in the previous case. As explained above, the issues in this action are distinct from those brought in the *EHR* action, and thus collateral estoppel is inapplicable even if Geisinger could raise it (it can't). For these reasons, Geisinger's collateral estoppel arguments fail.

### D.   The Statute of Limitations Does Not Bar Dr. Polansky's Claim

The False Claims Act has a six-year statute of limitations. 31 U.S.C. § 3731(b). Dr. Polansky's claims are timely so long as he alleges a fraudulent scheme on or after April 10, 2014.[4]

---

[3] If EHR argues for a different outcome because the government moved to dismiss the *EHR* case without prejudice to itself, that argument is wrong. Even under the claim preclusion standard, "[o]nly a prior dismissal with prejudice (whether voluntary or involuntary) precludes later relitigating the dismissed claims." *Papera v. Pennsylvania Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020).

[4] Dr. Polansky does not allege claims from before April 10, 2014, as Geisinger recognizes. MTD at 43-44.

*Inc.*, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018) (summary judgment stage); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (6th Cir. 2016) (same). Those cases have no application on a pre-discovery motion to dismiss. The last, *U.S. ex rel. Petratos v. Genentech, Inc.*, involved a relator who **conceded** that the Government would still have paid even if it had actual knowledge of the false claims. 855 F.3d 481, 489 (3d Cir. 2017). Relator has made no such concession in this case.

For these reasons, Dr. Polansky has successfully pleaded materiality.

G.    Relator Alleges Claims Under the Stark Act

1.    **Dr. Polansky pleaded the factual allegations underlying his Stark Act claim in his original complaint.**

Geisinger's perfunctory argument that Dr. Polansky violated the False Claims Act's sealing requirement by adding a Stark Act claim is unfounded.

Dr. Polansky's factual allegations underlying his Stark Act claim are substantively identical across his original and amended complaints: hospitalists employed by Spirit Physician Services were paid bonuses to refer inpatients to Geisinger Holy Spirit, and this led those hospitalists to make inpatient status determinations that they otherwise would not have made. *Compare* ECF No. 1 ¶¶ 170-176 *with* Compl. ¶¶ 168-174. Geisinger concedes that the two complaints are substantially similar. *See* MTD at 22 ("[T]he amended complaint makes only modest changes from the original complaint."). It is non-controversial that "an amended complaint that is substantially similar to the original complaint does not

need to be filed under seal," and courts deny motions to dismiss under those circumstances. *See E. Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure, Inc*., 2014 WL 2611312, at *3 (N.D. Cal. June 11, 2014), *citing U.S. ex rel. Davis v. Prince*, 766 F. Supp. 2d 679, 683 (E.D. Va. 2011) (same); *Wisz ex rel. U.S. v. C/HCA Dev., Inc*., 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998). The only case Geisinger cites is thus inapposite, because that case included "new factual allegations in support of a new theory of liability." *See United States v. Walgreen Co*., 2017 WL 10591756, at *4 (C.D. Cal. May 1, 2017).

2. **Dr. Polansky adequately pleaded a Stark Act claim against Geisinger Holy Spirit.**

   i) Polansky pleads a prima facie financial relationship forbidden by the Act.

The Stark Act forbids a hospital from submitting government payor claims for designated health services (like inpatient hospital services) that were provided via a referral from a doctor with whom the hospital has a financial relationship. *Bookwalter*, 946 F.3d at 168, *citing* 42 U.S.C.A. § 1395nn(a)(1). A government payor claim that violates the Act "is a false claim under the False Claims Act." *Bookwalter*, 946 F.3d at 168.

A financial relationship includes any "compensation arrangement," which is defined in the Act to include "any arrangement involving any remuneration" between the physician and a doctor. *Id.*, 946 F.3d at 168, *citing* 42 U.S.C.A.

§ 1395nn(h)(1)(A). Remuneration includes, of course, money. *Bookwalter*, 946 F.3d at 168, *citing* 42 U.S.C.A. 1395nn(h)(B).

Under federal regulations, forbidden compensation arrangements can be direct or indirect. *See* 41 C.F.R. § 411.354(c); *see also Bookwalter*, 946 F.3d at 168. An indirect compensation arrangement—which is what Dr. Polansky alleges in this case—exists if all of the following are true:

1) there is an unbroken chain of financial relationships between the referring physician and the entity furnishing designated hospital services ("the Entity");

2) the referring physician receives direct compensation that "varies with the volume or value of referrals or other business generated by the referring physician" for the Entity;

3) the compensation the referring physician receives could increase as the number or value of the physician's referrals to the Entity increases; and

4) the Entity has actual knowledge, or acts in reckless disregard, of the fact that the referring physician receives aggregate compensation that varies with the volume or value of referrals.

42 CFR § 411.354(c)(2)(i-iii).

Taken together, the Act forbids any knowing compensation arrangement that flows money from a hospital to a physician, where the amount of money could increase with the value of the referrals the physician makes to the hospital. That is the exact scheme that Dr. Polansky alleges:

1) Geisinger Holy Spirit (the Entity) pays Spirit Physician Services, which pays its hospitalist employees (the referring physicians);

2) the bonus the hospitalists receive on top of their ordinary compensation from Spirit Physician Services varies with the value of their referrals (inpatient

status orders—which include referral to Geisinger Holy Spirit—lead to higher RVUs and higher bonuses);

3) the hospitalists' bonus compensation increases if the hospitalists refer more inpatient services; and

4) Geisinger Holy Spirit was well aware of this scheme, including because Dr. Polansky repeatedly warned them of the compliance issues it created.

Compl. ¶¶ 168-174. Dr. Polansky's complaint thus pleads a prima facie Stark Act violation.

> ii) None of the Act's exceptions apply.

Although Geisinger does not say it, once Dr. Polansky pleads a prima facie violation under the Act—the scheme above—the burden flips to Geisinger to prove that one of the Act's exceptions applies. *See Bookwalter*, 946 F.3d at 169 ("[O]nce a plaintiff proves a prima facie violation of the Stark Act, the burden shifts to the defendant to prove that an exception applies."). Geisinger appears to argue the exception promulgated in 42 C.F.R. § 411.357(p)(1)(i) applies, which permits indirect compensation arrangements where the compensation "is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals . . . ."

Elsewhere, the regulations explain when compensation "takes into account the volume or value of referrals":

Compensation from an entity furnishing designated health services to a physician . . . takes into account the volume or value of referrals only if the formula used to calculate the physician's . . . compensation includes the physician's referrals to the entity as a variable, resulting in an increase or decrease in the physician's . . .

compensation that positively correlates with the number or value of the physician's referrals to the entity.

42 CFR § 411.354(d)(5)(i).  Thus, the Act's exception does not apply if the formula used to calculate the physician's compensation is positively correlated with the value of the physician's referrals.  That is, again, exactly the scheme Dr. Polansky alleges: the hospitalists' bonuses are "positively correlated" with the "value of the physician's referrals to the entity," because more inpatient status orders leads to both inpatient referrals and higher hospitalists RVUs, which lead to higher bonuses.  *See* 42 CFR § 411.354(d)(5)(i).  Geisinger bears the burden of showing this is not the case, which it cannot do given the facts alleged.

The Third Circuit's holding in *Bookwalter* confirms this.  That case involved a bonus scheme strikingly similar to what Dr. Polansky alleges in this case.  There, like here, physicians "were rewarded or punished based on how many Work Units they generated" through their surgical work.  *Bookwalter*, 946 F.3d at 167.  Like the incentive program in this case, the bonus program in *Bookwalter* "gave the surgeons an incentive to maximize their Work Units," *id.*, and led to physicians "artificially boosting their Work Units."  *Id.*  That scheme fell under the Act's purview because "every time the neurosurgeons performed a surgery or other procedure at the [defendant] hospitals, they made a referral for the associated hospital claims."  *Id.* at 170 (cleaned up).  The *Bookwalter* court concluded that the bonus scheme violated

the Act because it "took into account the volume and value of [the surgeons'] referrals." *Id.* at 171.

Critically, the *Bookwalter* court **did not** hold that value-based compensation schemes violate that Act **only if** they exceed fair market value—as the scheme appeared to do in that case—or only if certain "red flags" are present. The *Bookwalter* court said the opposite, noting that "[t]he Stark Act often treats *fair market value* as a concept distinct from *taking into account the volume or value of referrals*" and that "these two concepts are separate elements of many Stark Act exceptions." *Id.* at 171 (emphasis in original). Rather, it simply held that the red flags mentioned in that case were evidence of an improper scheme. *Id.* at 171.

The "red flags" the court mentioned—and that Geisinger insists are requirements to plead a value-based Stark Act claim—are thus not requirements at all. If the *Bookwalter* court wanted to require those flags, it easily could have done so. It did not. Nor did it require a relator "to plead more than the existence of an RVU-based bonus scheme," as Geisinger insists (without support or citation). MTD at 53. Instead, all Polansky must plead is that the hospitalists' compensation varied with the value of referrals it made to Geisinger. The Complaint alleges that it did, which is enough. *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 379 (4th Cir. 2015) (holding compensation scheme violative of the Stark Act when "the more procedure the physicians performed at the hospital, the more facility fees [the

hospital] collected, and the more compensation the physicians received in the form of increased base salaries and productivity bonuses.").  That the *Bookwalter* court revised its opinion on a motion for rehearing does not change this fact, because the court's ultimate opinion both recognized that RVU-compensation schemes may violate the Act and declined to ***require*** the presence of the "red flags" it discussed.

        iii)    CMS's regulatory guidance does not change this result.

To dodge this outcome, Geisinger misrepresents Dr. Polansky's allegations. Contrary to Geisinger's assertions, Dr. Polansky does not allege that RVU-compensation structures are *per se* violations of the Stark Act (or the False Claims Act).  Instead, he alleges that the specific scheme at issue in this case—bonuses paid by hospitals to physicians on top of their normal salaries, where the bonuses are higher if hospitalists make higher value referrals, and where physicians told Dr. Polansky they were making inpatient referrals to boost their bonuses—violate the Act.  CMS itself has recognized the potential for fraud nested in RVU-based compensation schemes like this one:

> Similarly, a physician who had a service or other compensation arrangement with an entity might increase his or her aggregate compensation if he or she made referrals that resulted in more Medicare payments to the entity. The physician self-referral statute was enacted to combat the potential that financial self-interest would affect a physician's medical decision making and ensure that patients have options for quality care. The law's prohibitions were intended to prevent a patient from being referred for services that are not needed or steered to less convenient, lower quality, or more expensive health care providers because the patient's physician may improve his or her

financial standing through those referrals. This statutory structure was designed for and made sense in Medicare's then-largely volume-based reimbursement system.

*See* Medicare Program; Modernizing and Clarifying the Physician Self-Referral Regulations, 85 Fed. Reg. 77492-01 (Dec. 2, 2020) (cited by Geisinger).

Geisinger is also wrong that 42 C.F.R. § 411.354(d)(2) creates any safe-harbor for the hospitalist scheme, because that section ***expressly does not apply*** to physician compensation schemes like this one (a fact Geisinger conspicuously excludes from its papers). *See* 42 C.F.R. § 411.354(d)(2) ("This paragraph (d)(2) does not apply for purposes of paragraphs (d)(5)(i) and (6)(i) [relating to compensation to and from a physician] of this section."). So the distinction that Geisinger draws between the number of referrals, on the one hand, and the "value" of referrals, on the other, from (d)(2)'s language is irrelevant. Under federal regulations, an indirect compensation scheme that positively correlates payments to physicians with the value of their referrals to hospital—the scheme alleged here—is violative of the Act. *See* 42 CFR § 411.354(d)(5)(i).

3.   **The Stark Act claim against Spirit Physician Services does not fail.**

Dr. Polansky properly states a Stark Act claim against Spirit Physician Services because each time a Spirit Physician Services doctor made an inpatient status order, it referred an inpatient hospital services order to Geisinger Holy Spirit.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA: HARRISBURG

|  |  |
|---|---|
| **THE UNITED STATES OF AMERICA** *ex rel.* **JESSE M. POLANSKY, M.D., M.P.H.,** | Civil Action No. 1:20-cv-00599 (Judge Conner) |
| *Plaintiff,* | |
| v. | **Leave to File Excess Pages Granted (Dkt. 83)** |
| **GEISINGER HOLY SPIRIT; GEISINGER COMMUNITY MEDICAL CENTER; GEISINGER MEDICAL CENTER; SPIRIT PHYSICIAN SERVICES INC.** | **Oral Argument Requested** |
| *Defendants.* | |

## REPLY IN SUPPORT OF THE
## DEFENDANTS' MOTION TO DISMISS

Daniel T. Brier
Donna A. Walsh
MYERS, BRIER & KELLY, LLP
425 Biden Street, Suite 200
Scranton, PA 18503
(570) 342-6100
dbrier@mbklaw.com
dwalsh@mbklaw.com

Dana M. McSherry*
Matthew L. Knowles*
Natasha L. Dobrott*
 *Admitted Pro Hac Vice*
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000
dmcsherry@mwe.com
mknowles@mwe.com
ndobrott@mwe.com

*Counsel for Defendants*                    August 26, 2024

**SA66**

### G.    Polansky's response confirms why his Stark Act claim fails as a matter of law.

#### 1.    The False Claims Act requires that this claim be presented to the Government under seal before being filed.

Polansky added a new Stark Act claim to his amended complaint. But he did not follow the procedure required under the False Claims Act: filing the case under seal, so the Government could first review whether to intervene, decline to intervene, or dismiss it. *See* 31 U.S.C. § 3730(b).

In his opposition, Polansky does not seriously dispute that where an amended *qui tam* complaint asserts a new theory of liability, it must first be presented to the Government under seal. *See* Opp. 58 (citing *United States v. Walgreen Co.*, No. CV09-1293, 2017 WL 10591756, at *4 (C.D. Cal. May 1, 2017)). The amended complaint plainly includes a new theory of liability: the Stark Act.

Thus, at a minimum, this count should be dismissed without prejudice so the Government can review it in accordance with the procedures in the False Claims Act.

#### 2.    The Stark Act claim against Holy Spirit fails.

Polansky's opposition shows that the parties do not disagree as to what the relevant factual allegations are, or what statutes and regulations supply the rule.

**These are the relevant factual allegations:** One component of the compensation that Spirit Physician Services paid to the hospitalists was a bonus program calculated based on the units of work, called RVUs, that they performed at the hospital. AC ¶¶ 168–70. The number of RVUs for each kind of patient encounter are

not set by Geisinger, but rather by the Government. *See* 42 C.F.R. § 414.22. When a hospitalist treats a patient, the "number of units of work for a case is greater if a patient is in inpatient status than if the patient is in outpatient status." AC ¶ 170. Polansky *does not* allege that hospitalists are paid extra to admit inpatients or that more RVUs are awarded for the admission decision itself. Rather, the supposed incentive is that the hospitalists' bonuses are higher when there are proportionately more inpatients in the hospital to treat, because treating someone who is an inpatient results in more RVUs.

**Polansky and Geisinger agree about the statues and regulations that apply.** The Stark Act is implicated where physician compensation "takes into account the volume or value of referrals," and the regulation that Polansky cites, 42 C.F.R. § 411.354(d)(5)(i), provides the standard to determine if RVU-based compensation takes into account volume or value. Opp. 60-61. It states:

> Compensation … takes into account the volume or value of referrals **only if** the formula used to calculate the physician's … compensation **includes the physician's referrals to the entity as a variable**, resulting in an increase or decrease in the physician's … compensation that positively correlates with the number or value of the physician's referrals to the entity.

42 C.F.R. § 411.354(d)(5)(i) (emphasis added).

But this is where Polansky departs from the law. He argues that any time a physician's compensation is positively correlated with the value of referrals, there is a violation. Opp. 61. This is flatly not what the regulation states. It states that compensation "takes into account" volume or value "only if" the compensation

includes *the specific physician's* referrals "as a variable," *and* there is then correlation.[4] Polansky relies on correlation alone. His aggregated and attenuated theory (more admissions generally means more inpatients which means more RVUs are available to earn) does not satisfy this rule.

> CMS guidance confirms this plain-language reading of the rule:

> We believe there is great value in having an objective test for determining whether the compensation is determined in any manner that takes into account the volume or value of referrals …

> Under our final regulations, which we believe create the bright-line rule sought by commenters and other stakeholders … **only when the mathematical formula used to calculate the amount of the compensation includes referrals or other business generated as a variable**, <u>and</u> **the amount of the compensation correlates with the number or value of the physician's referrals to or the physician's generation of other business for the entity**, is the compensation considered to take into account the volume or value of referrals….

85 FR 77492-01 (emphasis added). Because Polansky has not alleged facts showing that referrals are a "variable" in a "mathematical formula" used to determine compensation, *id.,* his Stark Act claim fails.

**Case law confirms the same outcome, although through a somewhat different approach.** *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162 (3d Cir.

---

[4] Without explanation, Polansky attempts to cast Geisinger's argument as invoking an "exception" to the Stark Act and argues that this would "flip" the "burden" to Geisinger to prove an exception. *See* Opp. 60. Not so. 42 C.F.R. § 411.354(d)(5)(i) expressly defines when RVU-based compensation takes into account volume or value of referrals; where it does not, there is no violation. In other words, this is an element of the cause of action, and has nothing to do with any exceptions to the Stark Act.

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

THE UNITED STATES of AMERICA )
3  EX REL JESSE M. POLANSKY,    )
M.D., M.P.H.,                   )
4              Plaintiff        )   1:20-CV-00599
          vs                    )
5  GEISINGER HOLY SPIRT, ET AL, )
               Defendants       )
6

          TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
7        BEFORE THE HONORABLE JOSEPH F. SAPORITO, JR.
               FRIDAY, MARCH 7, 2025
8              WILKES-BARRE, PENNSYLVANIA

9  FOR THE PLAINTIFF:
       NICHOLAS C. CARULLO, ESQ.
10     Susman Godfrey, LLP
       One Manhattan West
11     50th Floor
       New York, NY  10001
12
       JEFFREY W. GOLAN, ESQ.
13     Barrack, Rodos, & Bacine
       3300 Two Commerce Square
14     2001 Market St.
       Philadelphia, PA  19103
15
FOR THE DEFENDANTS:
16     MATTHEW KNOWLES, ESQ.
       McDermott, Will, & Schulte, LLP
17     200 Clarendon Street
       Suite 58th Floor
18     Boston, MA  02116
19     DONNA A. WALSH, ESQ.
       Myers, Brier, & Kelly, LLP
20     425 Biden Street
       Suite 200
21     Scranton, PA  18503

22 Proceedings recorded by machine shorthand, transcript produced
   by computer-aided transcription.
23 _____
24         SUZANNE A HALKO, RMR, CRR
           CERTIFIED REALTIME REPORTER
25          235 N. WASHINGTON AVENUE
           SCRANTON, PENNSYLVANIA  18503

SA70

11

1           When you think about the policies behind the
2   Government action bar, saying that you had a lot of false
3   claims cases, but once the Government becomes a party, that's
4   the case that decides these allegations and these transactions.
5   That's the forum to do it.  That's the purpose of the
6   Government action bar.  This seems entirely contrary to that
7   purpose.
8           Dr. Polansky is essentially coming to a different
9   court in different districts on the same allegations and the
10  same transactions and asking for a do-over, and that's exactly
11  what this bar is supposed to prevent.
12          Dr. Polansky has a couple other --
13          THE COURT:  Could I just stop you for one moment?
14          MR. KNOWLES:  Yes, Your Honor.
15          THE COURT:  With respect to the allegations in
16  Polansky 1, I know your position is that they are the same as
17  they are in Polansky 2, correct?
18          MR. KNOWLES:  Well, they are certainly broader, but
19  the allegations in Polansky 2 are in Polansky 1.
20          THE COURT:  But in Polansky 2, are there any
21  instances that were not alleged in Polansky 1?
22          MR. KNOWLES:  So, I think the only thing we see in
23  Polansky 2 that we concede is not in Polansky 1 is the Stark
24  theory that was added in the amended complaint here, but what
25  the test is -- the test is not a test of perfect symmetry.

1  It's not that they have to be identical.  It's that they have

2  to be based upon the same allegations or transactions and they

3  are.  Certainly, the case that he brought, which did not have

4  the Stark claim in it, it was all there.  It was based upon it.

5          He does point to the verb tense here.  So, if you

6  look at the bar here, it says is based upon, and it says are

7  the subject of.  Dr. Polansky's arguments on the second word,

8  the are, is that that means the bar doesn't apply to when the

9  first case is no longer pending.

10         Now, he concedes that the is a party doesn't make any

11  difference because you're a party whether the case is over or

12  not.  That was a holding in Biotroniks.  Dr. Polansky agrees to

13  that.  He concedes that on Page 29 of his brief, but he focuses

14  on the based upon the allegations or transactions that are the

15  subject.  He says, well, once the first case is over, they're

16  not the subject of it anymore.

17         That is a distinction that I think we can reject.  It

18  has no merit, really, for four reasons.  First, it's a new

19  decision.  No court has ever held that that distinction limits

20  the Government action bar to pending cases.

21         There is one case I think that analyzes the issue

22  somewhat, which is the Gadbois District Court decision from

23  Rhode Island, and it rejects it for exactly the reasons that we

24  argued in our papers.

25         The second, there is no dispute here.  Dr. Polansky

1 brought this present case while the first case was pending, and

2 when Congress wanted to limited a bar to a pending case, it

3 knew how to do so because it did that in the first file bar.

4 So the first file bar is absolutely limited to pending cases.

5 It says it right in there, and that issue went to the Supreme

6 Court, the Kellogg Brown and Root decision, which said, the use

7 of pending in first to file means the first-to-file bar doesn't

8 block a new case that you bring after the first case is over

9 because first to file says pending in it.  Government action

10 doesn't, doesn't have that word.

11          We would suggest the Court shouldn't read that word

12 into it where it's present in one and not the other because it

13 would collapse a few bars for saying the same thing, and

14 obviously that's not how we're supposed to interpret the

15 statute there where it would make the first bar surplusage.

16          That analysis does appear in the Biotroniks decision

17 from the Ninth Circuit, as well as the Gadbois First Circuit

18 District Court decision which looks at that.

19          It also feels like a common sense test, Your Honor.

20 The case is about allegations and facts.  What it's about

21 doesn't change when there's final judgment.  The case is about

22 the same thing before and after that final judgment.  It

23 doesn't change.

24          Then, fourth, even if Polansky were right about all

25 these things, which I don't think he is, he brought this case

1  in violation of the bar.  When he filed it, there's no dispute

2  the first case was pending, and the Supreme Court tells us --

3  this is from the State Farm decision, 137 Supreme Court 436 --

4  that the remedy for violating one of these bars in the False

5  Claims Act is dismissal.  That is what the Supreme Court said

6  in State Farm, and I think that should follow here.

7       So, let me pause there.  There is obviously a lot --

8  there is a lot in front of us and a lot of other things, but I

9  think this issue is reasonably straightforward, and it's a

10  mandatory basis for dismissal of this case.

11       I would go from there, Your Honor, to first to file.

12  I think I can do this much quicker because, you know, of what

13  we covered already, but let me start with the language of the

14  first-to-file bar and explain why that too applies and that

15  requires dismissal, at least dismissal without prejudice.  The

16  Government action bar would require dismissal with prejudice.

17       So, the first-to-file bar says that when a person

18  brings an action under this subsection, no other person, other

19  than the Government, may intervene or bring a related action

20  based on the facts underlying the pending action.  So that's

21  where we see that pending action bar.

22       Why does it apply here?  Well, it applies here

23  because both cases are based on the same facts for the reasons

24  I just reviewed, and because this case was brought when the

25  first case was pending.  So, under State Farm, it should be

**15**

1  dismissed.

2          Dr. Polansky, his first response here is the amended
3  complaint that he filed in the Spring of 2024, last spring.  He
4  said that because he amended after Polansky 1 stopped being
5  pending, the bar goes away and the problem solved.

6          I guess that would be sort of a neat way to solve it,
7  but it doesn't work under the juris prudence of nearly all or
8  potentially all of the circuits, and it doesn't work under the
9  Federal Rules of Civil Procedure.

10          First, of course, we have State Farm, which says,
11  quote, "The False Claims Act" -- this is from State Farm --
12  "The False Claims Act has a number of provisions that do
13  require in express terms the dismissal of a relator's action."
14  Then, the first thing it cites is 3730(b)(5), the first-to-file
15  bar requires dismissal.

16          I think that answers the question, but even if it
17  didn't, we could look to opinions like the Eleventh Circuit's
18  decision in Surgery Partners versus Cho, which pointed out that
19  the prohibition isn't about amendment.  It's about when you
20  bring the case.

21          The Eleventh Circuit noted that nearly every circuit
22  to consider this has endorsed exactly the reasoning I just
23  pointed to, and that's right.  So, the Second, Fourth,
24  Eleventh, and D.C. Circuits have all directly rejected Dr.
25  Polansky's interpretation that an amended complaint fixes his

1 problems.  The Seventh and Ninth have also held that what
2 matters is if the earlier case was brought while the first was
3 pending.

4          I think the D.C. Circuit's position probably explains
5 it the best.  This is the Shea case, 863 F.3d 923.  Shea
6 explains exactly this analysis that I just set out, and the
7 Third Circuit has cited Shea, not on this issue, but it's cited
8 other parts of Shea favorably.  So obviously the Circuit is
9 aware of that decision.

10          Dr. Polansky did not discuss any of these cases from
11 the other Circuits.  He didn't try to distinguish them.  What
12 he did was rely on the First Circuit's reasoning in the Gadbois
13 case.  What he says here is that Gadbois allows him to amend,
14 once the first case is over, problem solved.  We respectfully
15 submit that Dr. Polansky has misread that case.  That was not
16 what happened in the case.  That's not what the case holds.
17 First of all, it's a decision before State Farm.  So it didn't
18 look at the State Farm issue.

19          What Gadbois did is it talked about supplemental
20 complaints.  So Rule 15 has a lot of amendments and supplements
21 in there.  Some are similar in ways, but they are different,
22 and the key difference in amendments and supplements is
23 amendments generally relate back in time.  Supplements don't.
24 Rule 15 says amendments relate back.  The Gadbois decision was
25 about supplements, not amendments.  There is no supplement

1  here.  Dr. Polansky hasn't asked to supplement, and if he did,
2  it would be futile.

3        So what the First Circuit said is, a supplement
4  doesn't relate back, so it wouldn't trigger this issue.  It's
5  essentially like a new complaint.  I understand the reasoning.
6  It sort of makes sense.

7        An amendment, on the other hand, definitely doesn't
8  fix it because if he amends in 2024 and relates back to 2020,
9  the case is pending in 2020 when he amends back.  Supplement
10 doesn't relate back.

11       So, the First Circuit didn't say, problem solved.  It
12 said to the relator in Gadbois, on remand, you can go back to
13 the District Court, you can ask to supplement, which they did,
14 and if you read that District Court opinion, the answer was no.
15 The District Court of Rhode Island denied the motion to
16 supplement for exactly that reason.  First, it noted that State
17 Farm had come down, but, second, it said that this would be
18 futile because so much time has passed now that the supplement,
19 which doesn't relate back, is way outside the Statute of
20 Limitations.  That, I think, is the same answer through
21 slightly different reasoning.  You get to the same place.

22       The only other case I would note on this one is the
23 Cephalon case, an EDPA District Court decision on Page 26 of
24 Dr. Polansky'S brief.  The Eastern District there took a
25 slightly different path but got, again, the same answer, which

**18**

1  is to say, it allowed an amendment to address first to file

2  once the earlier case ended, but it said, unlike the usual

3  circumstance, that amendment cannot relate back, because if it

4  did relate back, first to file comes back to life.  So the

5  amendment doesn't relate back.  The Statute of Limitations

6  starts from the date of the amended complaint.  You sort of get

7  to the same place, I think, through different reasoning.

8          The other thing I want to address on first to file

9  squarely is Dr. Polansky's reliance on a case from the Tenth

10  Circuit.  This is the In Re:  Natural Gas Royalties case that

11  talks about the first-to-file bar.  What it says is, the

12  first-to-file bar does not apply unless the parties are exactly

13  symmetrical between the first and second case.  So Dr. Polansky

14  says this Court should take the same path there.

15          I would suggest that's not right for a few reasons,

16  Your Honor.  It's an older case.  It's 2009.  Where a lot of

17  the more recent Supreme Court analysis of the False Claims Act,

18  they apply the facts of the law that's written.

19          It's also an approach that seems inconsistent to the

20  Court decision from the Third Circuit which says that

21  complaints don't have to be symmetrical.  It's just that they

22  have to have the same core facts in them.

23          There's an opinion from the District of Delaware --

24  and that's obviously within the Third Circuit -- looking at

25  that natural gas case in this context and saying that we think

42

1 14, 2020?

2        MR. CARULLO:  All of them, and here's why:  So, I
3 talked a minute ago about Foglia.  That was the Third Circuit
4 case that said you do not need to plead specific false claims
5 in order to make a False Claims Act, that a complaint could
6 survive a motion to dismiss.

7        So, it does not matter that Dr. Polansky has not
8 submitted with his complaint specific claims saying, you know,
9 this Claim A, this one right here, this is false.  He doesn't
10 need to do that.  What he needs to do is allege the fraudulent
11 scheme.  He needs to have the who, the what, the when, and the
12 how of the fraudulent scheme within the limitation period, and
13 he does that.

14        As my friend on the other side mentioned, Dr.
15 Polansky was employed by Geisinger Holy Spirit until the end of
16 May, so within the limitation period.  While he was at
17 Geisinger Holy Spirit within the limitation period, all of the
18 things described in the complaint were happening.  He was
19 observing EHR certifications being used to make patients
20 inpatient, even though they were not forecasting length of stay
21 as required under Medicare.  He was telling his executives,
22 this is a compliance issue.  These are not in conformance with
23 Medicare regulations.  They were ignoring him.  He was watching
24 this happen over and over and over again, and it continued
25 until he was terminated in May.  He knows that the hospitals

**43**

1 had an EHR contract that continued at least until he was

2 terminated, and he had no reason to believe that they would

3 have continued further than that.

4          There's a case cited in our papers -- I'm sorry.  I

5 forgot the name at the moment -- that states that it doesn't

6 matter if some of the claims goes beyond the date in which an

7 employee was terminated.  If the scheme continued, if you

8 described the scheme, and it meets 9(b), and at the time of

9 your termination, it's still ongoing, that's enough to get you

10 past the motion to dismiss, because then we would enter

11 discovery, and then what I'm sure would confirm is that this

12 behavior continued beyond the date that Dr. Polansky was

13 terminated.

14          But even if it hadn't, Dr. Polansky would still have

15 a claim with the Statute of Limitations period because in that

16 six-week period that he was there, he was watching this happen,

17 and the same goes for the Stark Act claim.  The hospital has a

18 bonus program, and that was still ongoing when Dr. Polansky was

19 terminated.  So he's alleged a scheme, and that occurred, that

20 he observed occurring within the limitation period.

21          Jumping back, if I can, Your Honor, to the bars.

22 Even if Your Honor finds that the EHR action pleads the same

23 material elements as the allegations in this complaint and the

24 claims in this complaint, there is still independent reasons

25 why Your Honor would not apply the first-to-file bar and the

1 Government action bar.

2         I will start with the first-to-file bar.  It's
3 because Dr. Polansky amended his complaint.  There is no
4 question that the amendment of the complaint occurred after the
5 EHR case was dismissed, after the Supreme Court dismissed the
6 case.  The only question is whether that amendment by itself is
7 enough to cure the procedural defect of the first-to-file bar.
8 It is.  We heard a little bit about Cephalon.

9         So, the Cephalon case is strikingly similar to this
10 one.  So, I should mention on the front end, before we talk
11 about Cephalon, the first-to-file bar is strictly procedural.
12 Your Honor could, from the bench today, rule that under the
13 first-to-file bar, this case is dismissed, and Dr. Polansky on
14 Monday could refile his claim.  Nothing under the first-to-file
15 bar prevents him from doing that.

16         Were that to happen, Geisinger would say, well,
17 actually the Statute of Limitations has kicked in, your
18 complaint is untimely, and it should be dismissed on that
19 ground.  That's exactly what the parties argued in Cephalon.

20         In Cephalon, the defendants said, Your Honor, first
21 to file isn't an academic exercise because you have the Statute
22 of Limitations for that issue, and what the Court held in
23 Cephalon is that "I find" -- I'm quoting -- "that it would be
24 unjust to require relators to refile their claims even though
25 their only procedural roadblock was dismissed over two years

**45**

1   ago and they have amended the complaint since then."  That is

2   what the Court held in Cephalon, and it adopted the reasoning

3   in Gadbois that you heard about a moment ago.

4          In Gadbois, the idea is Rule 15 cures procedural

5   defects.  An amended complaint can do that.  That's why an

6   amended complaint can step in for the date on which the

7   original action was brought.

8          It also goes to the purpose of the first-to-file

9   action certainly.  If the purpose of the first-to-file action

10   is that you don't want overlapping actions based on the same

11   material elements to be ongoing at the same time, you don't

12   have that issue here.

13          On the Government action bar, first, there's the

14   issue that it wasn't the Government that pleaded the EHR claim.

15   It was Dr. Polansky who pleaded the EHR claim.  This is a very

16   unusual circumstance, which I don't think I personally have

17   seen, and the few cases that have looked at this bar, where you

18   have the same relator across two complaints, what the

19   Government action bar is designed to do is; you don't want

20   follow-on relators who have limited original information to

21   bring the same complaint that the Government is already

22   pursuing.  The idea is that the Government should be able to

23   prosecute their fraud in the way they want to see them, and

24   they shouldn't have to worry about other relators kind of

25   bunging up the strategy.  That's the purpose of the Government

58

1 I discussed as well.  It's not precedent from the Eastern
2 District, the district court case.  It is true that in that
3 case, the District Court for the Eastern District said an
4 amendment would fix the first to file problem that existed
5 because the first case ended.
6         I'm looking at the case here.  What the Court said is
7 because the first amended complaint, the earlier complaint was
8 during the pending case, the later one is not.  None of the
9 claims from the first case survived, so the six-year Statute of
10 Limitations shall run from the newer complaint.
11         If that's the outcome here, the amended complaint of
12 2024, the Spring of 2018 is the limitations period.  There are
13 no allegations in the complaint within three years of 2018,
14 right?  2014 is the earliest allegation.  That might be, I
15 think, the entire ball game, Your Honor.
16         I don't believe that's the right approach.  I think
17 the approach of the Second, Third, Eleventh, and D.C. Circuits
18 make more sense, but even under the Cephalon approach, the
19 Statute of Limitations is 2018, and if the relator's position
20 is Cephalon is how the Court should approach it, I think that
21 resolves all of the issues.
22         THE COURT:  Let me just stop you there so I have some
23 continuity.
24         Mr. Carullo, what is your position on that?
25         MR. CARULLO:  So, the reason that we brought up

**59**

1  Cephalon, Your Honor, is that the language in Cephalon
2  identifies kind of the tension here where the first-to-file bar
3  doesn't say the relator can never bring these claims, right?
4  The idea is that you want to prevent a relator from bringing a
5  simultaneous action while the Government is off bringing an
6  action on the same claim.  That is the purpose of the
7  first-to-file bar.
8          The Cephalon Court, and the reason that was brought
9  to your attention, the Cephalon Court recognized that when the
10 action has already been dismissed, and this one is still
11 ongoing, it would be incongruous of the purpose of the
12 first-to-file bar to dismiss them for that reason.
13         Now, in terms of the Statute of Limitations, if what
14 the Cephalon Court is saying, which I don't think it is, which
15 is, under this set of facts, the Statute of Limitations has run
16 because Dr. Polansky alleged some things before the limitations
17 period and alleged some things after the limitations period,
18 I'm willing to agree with that.
19         THE COURT:  So would you agree then that the Statute
20 of Limitations approved in 2018 and not --
21         MR. CARULLO:  No, Your Honor.
22         THE COURT:  Why not?
23         MR. CARULLO:  Because what we don't agree, the
24 Statute of Limitations period is six years, not three.
25         THE COURT:  Well, as I understood Mr. Knowles'

**SA84**

1 position, he said the amended complaint was brought out in

2 2024.  Taking that as the date and working backwards would take

3 it to 2018.  Do you agree with that or not?

4          MR. CARULLO:  No, I don't.

5          THE COURT:  Your position is that it does relate

6 back?

7          MR. CARULLO:  Yes.  Our position is it does relate

8 back, and I would remind Your Honor that I don't think we even

9 get to this point because the EHR complaint doesn't allege the

10 same material elements.

11          If Your Honor decides the EHR complaint doesn't

12 allege the same material elements that's according to this

13 case, all of this falls away.

14          THE COURT:  Mr. Knowles.

15          MR. KNOWLES:  I think the only reason that Cephalon

16 said amendment is okay is because it said if amendment doesn't

17 follow the usual rule and relate back.  So if it relates back,

18 it doesn't fix anything.  If it doesn't relate back, then

19 Cephalon says problem solved, but you run six years back, and

20 so, here, it would be 2018.

21          The relator counsel pointed to, when he said it's

22 glaringly missing from Polansky 1, knowledge of Holy Spirit,

23 and I believe that is just inconsistent with the pleadings.

24          So, on Pages 26 and 27 of our brief, the tables on

25 the left-hand side quote directly from the pleadings in

# CERTIFICATIONS

I, Matthew L. Knowles, certify:

1.    I am a member of the bar of this Court;

2.    That I electronically filed this supplemental appendix with the Clerk of the Court using the CM/ECF system on December 12, 2025; that all participants in the case are registered CM/ECF users; and that service will be accomplished by the appellate CM/ECF system;

3.    The electronic supplemental appendix is identical to any paper copies; and

4.    The electronic version of the supplemental appendix was checked for computer viruses using Windows Security, version 1000.29429.0.1000, on December 12, 2025.

Dated: December 12, 2025            */s/ Matthew L. Knowles*
                                                     Matthew L. Knowles